STATE OF NORTH CAROLINA v. ROBERT LEE CARTER

No. 40A87

(Filed 28 July 1988)

**Criminal Law § 84; Searches and Seizures § 4— blood sample—invalid nontestimonial identification order—no good faith exception to exclusionary rule under N.C. Constitution**

There is no good faith exception under Art. I, § 20 of the North Carolina Constitution to the exclusion of evidence obtained by an unreasonable search and seizure. Therefore, Art. I, § 20 required the exclusion of evidence derived from a blood sample obtained by officers from defendant in reliance upon a nontestimonial identification order which was improperly issued because defendant was in custody where no search warrant authorizing the taking of defendant's blood was issued, defendant did not consent, and probable cause and exigent circumstances did not exist to justify a warrantless search.

Justice MITCHELL dissenting.

Justices MEYER and WEBB join in this dissenting opinion.

Justice MEYER dissenting.

Justices MITCHELL and WEBB join in this dissenting opinion.

APPEAL by defendant from judgments sentencing him to consecutive terms of life for conviction of rape in the first degree and thirty years for conviction of kidnapping in the first degree and to a term of two years, to run concurrently with the sentence for kidnapping, for conviction of misdemeanor assault, said sentences imposed by *Lee, J.,* at the 3 November 1986 session of Superior Court, ORANGE County. Heard in the Supreme Court 15 March 1988.

State v. Carter

*Lacy H. Thornburg, Attorney General, by Daniel C. Oakley, Special Deputy Attorney General, and John H. Watters, Assistant Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Appellate Defender, for defendant.*

MARTIN, Justice.

This case presents us with the question of whether there is a good faith exception under article I, section 20 of the North Carolina Constitution to the exclusion of evidence obtained by unreasonable search and seizure. We hold that there is no good faith exception to the requirements of article I, section 20 as applied to the facts of this case and, accordingly, we grant defendant a new trial because evidence that should have been excluded under our state constitution was admitted in the trial of his case.

Defendant was convicted of rape in the first degree, kidnapping in the first degree, and assault inflicting serious bodily injury on the seventy-eight-year-old victim.

Defendant contends on appeal that (1) taking a sample of his blood without a search warrant violated his rights under the federal and state constitutions, and (2) the record is inadequate to permit a conclusion that scientific testimony on blood types based upon the technique called electrophoresis is sufficiently reliable to permit its acceptance in a court of law. Because we hold that article I, section 20 of the North Carolina Constitution requires the exclusion of the scientific evidence derived from the blood sample, we do not find it necessary to reach other issues presented in this case. Nor do we find it necessary to review in detail all of the evidence presented at trial.

The state's evidence at trial showed that on 18 April 1986 defendant entered the home of the victim and forced her to go with him through her backyard and through a plowed field. He then raped her, severely beat her face, and left her unconscious. Defendant, a prisoner at the Orange County Prison Unit, had been working that day at Branson's sawmill, where he had a work-release job. At approximately 4:15 p.m. defendant was seen walking into the woods with a shovel and a roll of toilet paper, it being the practice of the workmen to relieve themselves in the

woods. He did not report to the van at 4:30 p.m. to be taken back to the prison unit as was expected of him. He was found by searchers at approximately 6:15 p.m., some thirty-three yards from where the victim was found unconscious at 11:00 p.m. Defendant smelled of alcohol and was dirty and disheveled. He was taken to a trailer on the sawmill grounds. The following day the victim's eyeglasses were found under defendant's hat in the trailer. A shovel and paper had been found near the unconscious body of the victim.

The victim's eyesight is considerably impaired, but she was able to describe her assailant as wearing a yellow shirt, a brown apron, work pants, and work shoes. This accords with the description of defendant's dress on the date in question given by witnesses with normal vision. The victim testified that her assailant covered his face but appeared to her to be wearing a red wig and to have a red complexion. Defendant was called "Red" by his co-workers at the mill.

On 21 April, State Bureau of Investigation agent William Weis made application for a nontestimonial identification order requesting, inter alia, that a blood sample be taken from defendant. The order was issued and blood was taken from defendant at North Carolina Memorial Hospital. Defendant made a pretrial motion to suppress any evidence obtained pursuant to the order because the resulting search violated the federal and state constitutions and constituted a substantial violation of chapter 15A of the North Carolina General Statutes. Defendant relied upon the holding in *State v. Welch*, 316 N.C. 578, 342 S.E. 2d 789 (1986), that drawing blood from an in-custody defendant without first obtaining a search warrant violated his fourth and fourteenth amendment rights under the Federal Constitution. *See also State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). However, in *Welch* this Court also recognized a good faith exception to the federal constitutional requirement that evidence illegally obtained not be admitted where an officer relied on a nontestimonial identification order to take blood from a defendant in custody. The trial court denied defendant's motion to suppress, ruling that "Officer Weis had acted in good-faith in obtaining the order . . . ."

At trial, SBI serologist Mark S. Nelson testified, over defendant's objection, that a blood smear on underwear seized from de-

fendant after he was returned to the Orange County Prison Unit on 18 April 1986 was consistent with the victim's blood type but definitely was not defendant's blood type. Defendant's blood type had been determined through analysis of the blood sample obtained on the authority of the contested nontestimonial identification order.

It is settled law in this jurisdiction that a nontestimonial identification order may not properly issue for identification procedures to be performed upon an in-custody suspect. We held in *Irick*, 291 N.C. at 490, 231 S.E. 2d at 840, that "Article 14 of Chapter 15A applies only to suspects and accused persons before arrest, and persons formally charged and arrested, who have been released from custody pending trial. The statute does not apply to an in custody accused." In *Welch*, this Court again held that the statute is not applicable for the issuing of a nontestimonial identification order when the suspect or accused is in custody. Similarly, article 14 of chapter 15A did not apply to the taking of the blood sample from defendant, who was in custody in the Orange County Prison Unit. Therefore, the question for resolution is whether the obtaining of the evidence from defendant violated his rights under our state constitution. Defendant argues that his rights under article I, section 20 of the North Carolina Constitution have been violated by the taking of the blood sample and the subsequent introduction at trial of evidence obtained from the sample. Because we decide this case on adequate and independent state constitutional grounds, we do not reach or decide the question of whether the challenged search violated defendant's fourth and fourteenth amendment rights under the Federal Constitution. The federal cases cited or discussed are being used only for the purpose of guidance and they do not compel the result that this Court has reached. *Michigan v. Long*, 463 U.S. 1032, 77 L.Ed. 2d 1201 (1983); *Jackson v. Housing Authority*, 321 N.C. 584, 364 S.E. 2d 416 (1988).

Our state constitution, like the Federal Constitution, requires the exclusion of evidence obtained by unreasonable search and seizure. *State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74 (1971); *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376 (1968), *cert. denied*, 393 U.S. 1087, 21 L.Ed. 2d 780 (1969). In language somewhat different from that of the fourth amendment to the United States Constitution, article I,

section 20 of the North Carolina Constitution forbids unreasonable search and seizure:

> General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.

Even were the two provisions identical, we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision. *Michigan v. Long*, 463 U.S. 1032, 77 L.Ed. 2d 1201; *State v. Arrington*, 311 N.C. 633, 642, 319 S.E. 2d 254, 260 (1984).

Until 1914 neither state nor federal search and seizure law knew an exclusionary rule, with the sole exception of the state of Iowa. In that year, the United States Supreme Court barred from the federal courts the use of evidence obtained by federal officers in an illegal search. *Weeks v. United States*, 232 U.S. 383, 58 L.Ed. 652 (1914). In *Wolf v. Colorado*, 338 U.S. 25, 93 L.Ed. 1782 (1949), the Court held that the fourth amendment is enforceable against the states through the due process clause of the fourteenth amendment, but declined to extend the exclusionary rule to the states. *Wolf* left the states free to experiment with various methods of protecting their citizens' fourth amendment rights. With the exception of the state of Iowa, which held illegally obtained evidence to be inadmissible into its courts as violative of its state constitution in 1903, *State v. Sheridan*, 121 Iowa 164, 96 N.W. 730,[1] no state supreme court anticipated *Weeks* by holding that its state constitution gave rise to an exclusionary rule. The states followed the common law rule that the admissibility of evidence was not affected by the means used to obtain it. In the landmark case of *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081 (1961), the United States Supreme Court held that the fourth amendment forbids the admission of illegally obtained evidence in state courts. Although the states did not anticipate *Weeks*,

---

1. *Sheridan* was overruled by *State v. Tonn*, 195 Iowa 94, 191 N.W. 530 (1923).

roughly half of them, including North Carolina, did not wait for *Mapp* but adopted an exclusionary rule under state law before that decision required that state courts exclude illegally obtained evidence under the Federal Constitution.[2] North Carolina repudiated the traditional common law principle in 1937 when the General Assembly enacted a statutory exclusionary rule, N.C.G.S. § 15-27. Thus the exclusionary rule was first received into our law fifty years ago, a quarter of a century before the *Mapp* decision mandated that under the Federal Constitution state courts must exclude illegally obtained evidence.

The withdrawal of a blood sample from a person is a search subject to protection by article I, section 20 of our constitution. *See Schmerber v. California*, 384 U.S. 757, 16 L.Ed. 2d 908 (1966); *State v. Welch*, 316 N.C. 578, 342 S.E. 2d 789. Although *Schmerber* and *Welch* were decided on federal constitutional grounds, an individual's constitutional rights under the Constitution of North Carolina must receive at least the same protection as such rights are accorded under the Federal Constitution. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 64 L.Ed. 2d 741 (1980). Therefore, under our state constitution, a search warrant must be issued before a blood sample can be obtained, unless probable cause and exigent circumstances exist that would justify a warrantless search. *Welch*, 316 N.C. 578, 342 S.E. 2d 789. Here, there were no exigent circumstances to justify a warrantless search; defendant's blood type would remain constant. No search warrant authorizing the taking of defendant's blood was issued. Therefore, obtaining the sample of defendant's blood violated his rights under article I, section 20 of the North Carolina Constitution to be free from unreasonable searches and seizures. Under our expressed public policy since 1937, the challenged evidence should have been suppressed. N.C.G.S. § 15A-974(1) (1983).

The state, however, urges this Court to adopt a "good faith" exception to our long-standing exclusionary rule. We now turn to address this issue.

Since deciding *Mapp* in 1961, the United States Supreme Court has limited the scope of application of the exclusionary rule

2. *Elkins v. United States*, 364 U.S. 206, 4 L.Ed. 2d 1669 (1960), contains an appendix presenting in tabular form the law of the states on admissibility of illegally seized evidence to that date.

in several cases. In each case the Supreme Court has weighed the costs of the more expansive application of the rule—which it has identified as that of a quantum of deterrence of police misconduct foregone—against the costs of lost probative evidence. In each case the Court has determined that the costs are too slight to outweigh the benefits of admissibility. Thus, in *Alderman v. United States*, 394 U.S. 165, 22 L.Ed. 2d 176 (1969), the Court held that a defendant has no standing to object to the admission of evidence obtained in violation of the fourth amendment rights of another. In *United States v. Calandra*, 414 U.S. 338, 38 L.Ed. 2d 561 (1974), the Court declined to apply the rule to grand jury proceedings. *United States v. Janis*, 428 U.S. 433, 49 L.Ed. 2d 1046 (1976), held that evidence illegally obtained by a state criminal law enforcement officer is admissible in a federal civil proceeding. *Stone v. Powell*, 428 U.S. 465, 49 L.Ed. 2d 1067 (1976), held that federal habeas corpus relief on the ground that illegally obtained evidence was admitted at trial is unavailable to a state prisoner who has had a full and fair state trial. *United States v. Havens*, 446 U.S. 620, 64 L.Ed. 2d 559 (1980), held that it is constitutionally permissible to admit illegally seized evidence to rebut a defendant's response to a matter first raised by the government during cross-examination.

In *United States v. Leon*, 468 U.S. 897, 82 L.Ed. 2d 677 (1984), the Supreme Court drew upon the analysis developed in these cases to work a more profound curtailment of the federal exclusionary rule. The Court there held that evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, although ultimately found to be unsupported by probable cause, may be admitted in the government's case in chief. Justice White, writing for the Court in *Leon*, directs that a case-by-case approach supplant the *Weeks/Mapp* per se rule in suppression cases involving warrants ultimately found to be inadequate. Justice White concludes:

> We have now reexamined the purposes of the exclusionary rule and the propriety of its application in cases where officers have relied on a subsequently invalidated search warrant. Our conclusion is that the rule's purposes will only rarely be served by applying it in such circumstances.

468 U.S. at 926, 82 L.Ed. 2d at 700. We must agree with the recent observation of the New Jersey Supreme Court, in its 1987

decision, *State v. Novembrino*, 105 N.J. 95, 519 A. 2d 820, that at least with respect to searches under warrant, the *Leon* good faith exception has swallowed the *Weeks/Mapp* rule:

> According to Justice White's formulation, in suppression cases involving warrants the application of the exclusionary rule will be the exception, and recognition of the good-faith "exception" will be the prevailing standard.

105 N.J. at 139, 519 A. 2d at 846.

From its introduction through the present day, the exclusionary rule has met strong criticism from able judges and commentators and has also evoked forceful support. We shall not here attempt to recount every episode in this well-known history.[3] Chief Justice Weintraub of the New Jersey Supreme Court distilled the essence of the continuing controversy in an opinion written three years before *Mapp* was decided:

> The exclusionary rule rests upon two propositions. The first is that government should not stoop to the "dirty business" of a criminal in order to catch him. The second is that civil and criminal remedies against the offending officer are as a practical matter ineffective, and hence the rule of exclusion is the only available remedy to protect society from the excesses which led to the constitutional right.

*Eleuteri v. Richman*, 26 N.J. 506, 512, 141 A. 2d 46, 49 (1958). We subscribe to these propositions, both with respect to the exclusionary rule and with respect to a good faith exception to it. To reach this conclusion we draw upon the past fifty years of experience in this state, as well as the experience of other states: The exclusionary rule is indispensable to achieve the purposes for which prohibitions against unreasonable search and seizure were written into the constitutions of the revolutionary era.

Sam J. Ervin, Jr., formerly a justice of this Court, wrote with respect to this question:

---

3. *See, e.g., People v. Defore*, 242 N.Y. 13, 150 N.E. 585 (1926), written by then Judge Cardozo, the best known case in which a state supreme court declined to follow the *Weeks* rule, and Wigmore's biting indictment of the *Weeks* decision, 8 Wigmore, *Evidence* § 2184 (3d ed. 1940).

This constitutional guaranty against unreasonable searches and seizures has its roots deeply implanted in the human heart, the common law of England, and tyrannies perpetrated by government on the people of England and the colonies.

The oldest and deepest hunger of the human heart is for a place where one may dwell in peace and security and keep inviolate from public scrutiny one's innermost aspirations and thoughts, one's most intimate associations and communications, and one's most private activities. This truth was documented by Micah, the prophet, 2,700 years ago when he described the Mountain of the Lord as a place where "they shall sit every man under his own vine and fig tree and none shall make them afraid" (MICAH 4:4).

The common law of England originated in the instincts, the habits, and the customs of the people. Hence, it is not surprising that on emerging from the mists of unrecorded history, the English common law embraced as a fundamental principle that every man's home is his castle and the correlative rule that every man may resist to the utmost unidentified persons who seek to enter his home against his will. . . .

. . . .

. . . The common-law courts of England . . . authorized searches and seizures only by special warrants, which were based on oaths disclosing the reasons for their issuance and describing the places to be searched and the persons or things to be seized.

The courts of England that were independent of the common law, such as the Court of Star Chamber . . . and the Court of High Commission . . . did not respect the principle of the common law that every man's home is his castle.

They authorized searches and seizures by general warrants, which were based on mere suspicion and commanded searches and seizures for the enforcement of particular laws without specifying the places to be searched or the persons or things to be seized. In so doing, the general warrants delegated to the persons executing them the autocratic

power to decide according to their own notions what places should be searched, what persons should be arrested, and what things should be seized. . . .

. . . .

. . . Despite honest beliefs of sincere persons to the contrary, the exclusionary rule is an essential ingredient of the Fourth Amendment. Apart from it, the Amendment's guaranty against unreasonable searches and seizures is worse than solemn mockery, and the Amendment might well be expunged from the Constitution as a meaningless expression of a merely pious hope. . . .

If letters and private documents can be thus seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.

Ervin, *The Exclusionary Rule: An Essential Ingredient of The Fourth Amendment*, The True Bill (N.C. Bar Ass'n), vol. 5, No. 1, at 1-3 (1985). The framers of our constitution sought to check the tendency of government to overreach by placing a constitutional mantle around the right to privacy in one's person, home, and effects. They therefore constitutionalized the probable cause standard and the requirement that the government limit the scope of its invasion of privacy by identifying the persons, places, and items to be searched or seized.

North Carolina was among a handful of states that adopted an exclusionary rule by statute rather than by judicial creation. The 1937 statute requiring the exclusion of evidence obtained under an illegal search warrant was amended in 1951 to extend the rule to apply to unlawful warrantless searches.[4] The amended

---

4. In 1938, *State v. McGee*, 214 N.C. 184, 198 S.E. 616, presented to the Supreme Court the very question of the admissibility of the fruits of illegal

State v. Carter

statute was repealed in 1969 and replaced, effective 1975, by N.C.G.S. § 15A-974. Section 15A-974 provides in pertinent part that "[u]pon timely motion, evidence must be suppressed if: (1) Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina." Since 1937 the expressed public policy of North Carolina has been to exclude evidence obtained in violation of constitutional rights against unreasonable searches and seizures.

The exclusionary sanction is indispensable to give effect to the constitutional principles prohibiting unreasonable search and seizure. We are persuaded that the exclusionary rule is the only effective bulwark against governmental disregard for constitutionally protected privacy rights. Equally of importance in our reasoning, we adhere to the rule for the sake of maintaining the integrity of the judicial branch of government.

The preservation of the right to be protected from unreasonable search and seizure guaranteed by our state constitution demands that the courts of this state not condone violations thereof by admitting the fruits of illegal searches into evidence. This thesis was adumbrated in *Weeks*. There Justice Day wrote:

> The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

232 U.S. at 392, 58 L.Ed. at 655. It was given its classical formulation by Justices Holmes and Brandeis in separate and prescient dissents in the 1928 decision, *Olmstead v. United States*, 277 U.S. 438, 72 L.Ed. 944. In his *Olmstead* dissent, Justice Holmes reasoned that "no distinction can be taken between the government as prosecutor and the government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business, it does not permit the judge to allow such iniquities

---

searches conducted without a warrant left open by N.C.G.S. § 15-27. The Court upheld the search over the dissent of Justice Devin, joined by Justice Stacy, who argued that the spirit if not the letter of the 1937 statute demanded the exclusion of an illegal warrantless search a fortiori since it forbade the admission of evidence obtained with a formally deficient warrant.

State v. Carter

to succeed." 277 U.S. at 470, 72 L.Ed. at 953. With more passion but with equal force, Justice Brandeis concluded his dissent with these words:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

277 U.S. at 485, 72 L.Ed. at 959-60.

Justice Brennan's dissent in *Leon* continues this line of interpretive argument about constitutional protections and the exclusion of illegally obtained evidence. Justice Brennan summarizes the position in these words: "The right to be free from the initial invasion of privacy and the right of exclusion are coordinate components of the central embracing right to be free from unreasonable searches and seizures." 468 U.S. at 935, 82 L.Ed. 2d at 706.

One of the great purposes of the exclusionary rule is to impose the template of the constitution on police training and practices. Unavoidably, a few criminals may profit along with the innocent multitude from this constitutional arrangement. As Justice Traynor noted in his opinion in *People v. Cahan*, 44 Cal. 2d 434, 449, 282 P. 2d 905, 914 (1955):

> He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught.

We conclude that the exclusionary rule has been a potent force for achieving its intended deterrent purpose. Warrants today are more carefully prepared and scrutinized before issuance. Likewise, the exclusionary rule is responsible for the systematic, in-depth training of police forces in the law of search and seizure.[5] It can be no part of our constitutional duties to signal a retreat from these salutary advances in constitutional compliance which have guided police practice in this state since 1937.

In our view, logic and history combine to refute those who hope to spare society the costs resulting from the exclusionary rule by adopting alternative remedies. In the period of history between *Weeks* and *Mapp*, when the states were free to experiment with effective alternative remedial devices, none were developed. The *Mapp* Court was forced to conclude that "other remedies have proved worthless and futile." 367 U.S. at 652, 6 L.Ed. 2d at 1088. The damage action, which has inspired the most interest as an alternative to the exclusionary rule, may provide some relief upon occasion to an individual whose rights have been invaded, but offers scant prospect of replacing the exclusionary rule as an institutional deterrent to unconstitutional invasions of privacy. In sifting the prospects of this alternative remedy, commentators have aptly noted that its many defects include the disinclination of juries to doubt the testimony of police witnesses about conduct undertaken to protect the public, the doctrine of sovereign immunity, the judgment-proof character of the working police officer, and the difficulty that the aggrieved plaintiff may encounter in finding and paying counsel to represent him in a damage action.[6] Article I, section 18 of our state constitution directs our courts to provide every person with a remedy for injury. We will not abandon a proven remedy in favor of one which, because its ineffectualness is patent beforehand, mocks this constitutionally mandated guaranty.

---

5. *See* Milner, *Supreme Court Effectiveness and Police Organization*, 36 Law & Contemp. Prob., 467, 475 (1971); Kamisar, *Public Safety v. Individual Liberties: Some "Facts" and "Theories,"* 53 J. Crim. L.C. & P.S. 171, 179-82 (1962); Sachs, *The Exclusionary Rule: A Prosecutor's Defense*, 1 Crim. J. Ethics 28, 31 (1982).

6. *See* Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum. L. Rev. 1365, at 1387-88 (1983); 1 W. LaFave, *Search and Seizure* § 1.2(c) (1987); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 430 n.37 (1974).

In determining the value of the exclusionary rule, we regard the crucial matter of the integrity of the judiciary and the maintenance of an effective institutional deterrence to police violation of the constitutional law of search and seizure to be the paramount considerations. We do not discount the implications of the failure to convict the guilty because probative evidence has been excluded in even one grave criminal case. The resulting injuries to victim, family, and society are tolerable not because they are slight but because the constitutional values thereby safeguarded are so precious.

The state, relying upon *Welch*, 316 N.C. 578, 342 S.E. 2d 789, argues that this Court should create a good faith exception to the exclusionary rule under our state constitution which would in the case before us permit the admission of evidence obtained by officers in objectively reasonable reliance on a nontestimonial identification order subsequently found to have been improperly issued. In interpreting the Federal Constitution in *Welch*, we adopted the holding of *Leon*, 468 U.S. 897, 82 L.Ed. 2d 677, and extended it to a case not involving a defective search warrant. Except for *Illinois v. Krull*, 480 U.S. ---, 94 L.Ed. 2d 364 (1987), the United States Supreme Court has applied a good faith exception to the exclusionary rule only in cases involving defective search warrants. *E.g., Massachusetts v. Sheppard*, 468 U.S. 981, 82 L.Ed. 2d 737 (1984).

Here, one of the dissents relies heavily upon *Krull*. The distinctions of the present case and *Krull* are obvious. In *Krull*, the Supreme Court, in a 5 to 4 decision, applied a good faith exception to an unconstitutional search where the officer in good faith relied upon a statute authorizing warrantless administrative searches, the statute ultimately being found to violate the fourth amendment. *Krull* involved the least intrusive of searches, the search of an automobile wrecking yard to determine if the automobile parts dealer was complying with the Illinois Vehicle Code. The Court reasoned that where the officer in good faith relies upon such statute, the deterrent effect of the exclusionary rule is lost.

We are presently concerned with the *most* intrusive search, the invasion of defendant's body and the withdrawal of defendant's blood. Our constitution, as well as the Federal Constitution,

requires a valid search warrant for this purpose. The United States Supreme Court in *Krull* based its reasoning on the lack of deterrence to avoid the exclusionary rule. North Carolina, however, justifies its exclusionary rule not only on deterrence but upon the preservation of the integrity of the judicial branch of government and its tradition based upon fifty years' experience in following the expressed public policy of the state. Under the judicial integrity theory, our constitution demands the exclusion of illegally seized evidence. The courts cannot condone or participate in the protection of those who violate the constitutional rights of others. Although the United States Supreme Court applied a cost-benefit analysis in *Krull*, the basis of our exclusionary rule is not suited to such simplistic resolution of the issue. *See generally* Note, *Illinois v. Krull: Extending the Fourth Amendment Exclusionary Rule's Good Faith Exception to Warrantless Searches Authorized By Statute*, 66 N.C.L. Rev. 781 (1988).

In the present case we are not bound by our holding in *Welch* because here we are construing our state constitution rather than the Federal Constitution.

Counsel for the state argue that we should follow *Leon* and *Welch* because an order pursuant to article 14 of chapter 15A of the North Carolina General Statutes is tantamount to a search warrant. This argument must fail because the taking of a blood sample without consent violates our state constitution unless done pursuant to a valid search warrant or upon probable cause and under exigent circumstances. *Leon*, 468 U.S. 897, 82 L.Ed. 2d 677; *Schmerber v. California*, 384 U.S. 757, 16 L.Ed. 2d 908; *State v. Fisher*, 321 N.C. 19, 361 S.E. 2d 551 (1987). A nontestimonial identification order will not fulfill this requirement. This is true because a nontestimonial identification order can be issued without a probable cause finding as required for the issuance of a search warrant. N.C.G.S. §§ 15A-273, -242, -245 (1983). Probable cause to *arrest* cannot satisfy this requirement. There must be probable cause to believe that the item to be seized constitutes evidence of an offense or the identity of a person who participated in the crime in order to secure a search warrant. N.C.G.S. § 15A-242(4). A nontestimonial identification order may be issued upon a finding, as to the item to be taken, that it will be of "material aid in determining whether the person named in the affidavit committed the offense." N.C.G.S. § 15A-273(3). Further, the

requirement of N.C.G.S. § 15A-273(2) that there be "reasonable grounds to suspect" that the person named committed the offense fails to rise to the level of the probable cause requirement necessary to obtain a search warrant. *See* Comment, *Criminal Law and Procedure—Nontestimonial Identification Orders Without Probable Cause*, 12 Wake Forest L. Rev. 387 (1976).

It must be remembered that it is not only the rights of this criminal defendant that are at issue, but the rights of all persons under our state constitution. The clearly mandated public policy of our state is to exclude evidence obtained in violation of our constitution. N.C.G.S. § 15A-974(1). This policy has existed since 1937. If a good faith exception is to be applied to this public policy, let it be done by the legislature, the body politic responsible for the formation and expression of matters of public policy.

We are not persuaded on the facts before us that we should engraft a good faith exception to the exclusionary rule under our state constitution.

We reverse the ruling of the court below admitting the blood evidence and grant the defendant a new trial.

New trial.

Justice MITCHELL dissenting.

By refusing to permit the introduction of evidence seized by officers acting in the honest belief that a court order authorizing its seizure was lawful, this Court gives much greater protection to criminal defendants than they have been given by the Supreme Court of the United States. In fact, the Supreme Court has specifically stated in a similar situation, "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90, 82 L.Ed. 2d 737, 744 (1984). We should take the same position as to the court ordered search in this case.

In its failing effort to strike a proper balance between the guarantee against unreasonable searches and the public safety, the majority has chosen to place such a heavy thumb on the scales of justice that they will always weigh in favor of the crim-

State v. Carter

inal defendant. The inflexible exclusionary rule the majority has selected for North Carolina will not advance the right to be free from unlawful searches, but it will prevent trial courts from reaching the truth and convicting the guilty in a substantial number of cases. The majority should recognize a good faith exception to our exclusionary rule similar to that applied by the Supreme Court under the Constitution of the United States. To do otherwise serves no valid purpose, substantially interferes with enforcement of the criminal law and diminishes the integrity of the judicial branch of government. Therefore, I dissent.

I recognize that our State Constitution, like the Constitution of the United States, requires the exclusion of evidence obtained by an unreasonable search and seizure. *State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840, 30 L.Ed. 2d 74 (1971). I even agree with the majority that in the past the exclusionary rule may have been the only practical remedial device for preventing unreasonable searches and seizures. *But see United States v. Leon*, 468 U.S. 897, 918, 82 L.Ed. 2d 677, 696 (1984). Even the majority seems to recognize, however, that conditions causing the Supreme Court of the United States to first adopt the exclusionary rule have largely ceased to exist.

One need only read any daily newspaper on a regular basis to know that civil judgments against law enforcement officers for violations of constitutional rights are no longer unusual. Indeed, it is now quite possible for evidence unlawfully seized to be excluded in a criminal case against an accused, while the accused receives additional or double relief in the form of a civil judgment for the same violation of rights. The decision of the majority here greatly increases the likelihood of cases in which criminals will be set free while, at the same time, public officials who have made honest mistakes in good faith are required to pay them damages. It is obvious beyond any need for further discussion that such cases will not further the majority's goal of promoting the integrity of the judiciary, but will result, instead, in the judiciary being subjected to well-deserved ridicule by the general public.

The majority has devoted several pages of its opinion to noble and stirring quotations of legal luminaries of the past, such as former Justices Holmes and Brandeis and our own Sam J. Ervin, Jr., former United States Senator and former Justice of this

Court. Although I agree with almost everything contained in those quotations from decades past, it appears that their scope and grandeur have blinded the majority to the obvious fact that they have almost no relevance to the present case.

The high-minded quotations relied upon by the majority warn against permitting courts to be used to further the designs of law enforcement officers who *intentionally* break the law to gather evidence against criminals. All courts have taken those warnings to heart, and evidence seized by *intentionally* unlawful methods has been excluded under the Fourth Amendment to the Constitution of the United States for decades. *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081 (1961). Further, evidence seized by such intentionally unlawful means is not rendered admissible by the good faith exception to the exclusionary rule. *See United States v. Leon,* 468 U.S. 897, 82 L.Ed. 2d 677 (seizure under defective search warrant); *State v. Welch,* 316 N.C. 578, 342 S.E. 2d 789 (1986) (under non-testimonial identification order). The majority simply has chased a constitutional rabbit which was caught and skinned long ago.

By definition, the "good faith exception" to the exclusionary rule applies *only* in situations in which law enforcement officers have acted under the objectively reasonable belief that their actions were lawful and correct. Although the majority implies that by choosing a rule which excludes such evidence seized in good faith it somehow protects our privacy from invasion—by police, not by criminals—the majority completely fails to tell us how exclusion of evidence seized by officers in good faith reliance upon a court order will further this noble purpose. This failure of the majority is quite understandable, since exclusion of evidence in such cases will serve no valid purpose and will greatly harm the innocent public. *See generally United States v. Leon,* 468 U.S. 897, 82 L.Ed. 2d 677.

Only in recent years have researchers begun to study the effects of the exclusionary rule. At least one study indicates that the rule results in either a failure to prosecute or a failure to convict as much as 2.35% of all those arrested for felonies. *Id.* at 907-09 n.6, 82 L.Ed. 2d at 688-89 n.6 (citing California study). The same study suggests that the exclusionary rule is an even greater impediment to prosecutions for particular crimes such as drug

crimes which are unusually dependent on physical evidence. *Id.* Thus, it has been estimated that the exclusionary rule results in the failure to prosecute or the failure to convict in as much as 7.1% of felony drug charges. *Id.* Additionally,

> the small percentages . . . mask a large absolute number of felons who are released because the cases against them were based in part on illegal searches or seizures. "[A]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official unlawfulness." *Illinois v. Gates*, 462 US at 257-258, 76 L Ed 2d 527, 103 S Ct 2317 (White, J., concurring in judgment).

*Id.*

Even the terribly undesirable result of preventing criminal prosecutions by denying "the jury access to clearly probative and reliable evidence" would be an acceptable price to pay in cases such as this, *if it would have any substantial deterrent effect* on violations of constitutional liberties. Rejection of the good faith exception to the exclusionary rule, however, "can have no substantial deterrent effect in the sorts of situations under consideration in this case . . . [and] cannot pay its way in those situations." *Id.* The majority's calculated choice to reject the good faith exception to the exclusionary rule under our state constitution simply will *not* make our people more secure in their right to be free from unreasonable searches.

In the present case, officers relying in good faith upon a *written judicial order* took a sample of the defendant's blood for analysis and use as evidence. It should be obvious to anyone that excluding this evidence will not deter other officers from making similar mistakes in good faith as to the legal validity of court orders upon which they rely. When following judicial orders in the future, the officers still will not know they are doing anything wrong. Therefore, unlike punishment of intentionally unlawful conduct by officers, which the exclusionary rule arguably deters, punishment of an officer's good faith reliance on a judicial order cannot deter future similar conduct.

Certainly, a refusal to recognize a good faith exception to the exclusionary rule will have no significant "deterrent" effect on

judges and magistrates. As the Supreme Court of the United States has correctly pointed out:

> To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates . . . , their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.
>
> Third, and most important, we discern no basis . . . for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. . . . And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessarily meaningful to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Id.* at 916-17, 82 L.Ed. 2d at 694-95 (footnotes omitted). The same common sense reasoning is applicable to cases such as this, in which the search has been conducted pursuant to a nontestimonial identification order. *State v. Welch*, 316 N.C. 578, 342 S.E. 2d 789. Further, the reasoning of the Supreme Court is not made any less compelling by virtue of the fact that this issue arises under our State Constitution rather than the Constitution of the United States. The exclusionary rule is identical under both constitutions, and the good faith exception to that rule also should be applied equally under both constitutions.

The Supreme Court of the United States has always restricted application of the exclusionary rule "to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 38 L.Ed. 2d 561, 571 (1974). The Supreme Court also:

> has acknowledged that the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case. . . . [Supreme Court] cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury. . . . After all, it is the defendant, and not the constable, who stands trial.

*United States v. Payner*, 447 U.S. 727, 734, 65 L.Ed. 2d 468, 476 (1980) (citations omitted). This Court should adopt the same common sense reasoning expressed in such statements by the Supreme Court of the United States and apply it here. Regrettably, however, the majority chooses to be more dogmatic and doctrinaire than the Supreme Court of the United States in protecting criminal defendants by excluding evidence uncovered through honest mistakes of officers acting in good faith reliance upon court orders. I recognize that it is within the power of the majority to give criminal defendants greater protections under our State Constitution than those given them by the Constitution of the United States or the decisions of the Supreme Court of the United States; I simply think the majority is wrong to do so in the context of this case.

In the context of cases such as this, the majority's doctrinaire application of our exclusionary rule truly becomes a "mere technicality" applied with a vengeance to block enforcement of the criminal laws for no good reason. Application of the exclusionary rule here will not deter any future misconduct by anyone or lessen the likelihood of future infringements upon anyone's constitutional rights. The only effect of the majority's rejection of a good faith exception to the exclusionary rule in cases such as this is to punish the public by impeding the truth-finding function of its courts. This drastic choice by the majority does not lead to any corresponding societal or constitutional gain for anyone other than criminal defendants lucky enough to have officers make

honest errors in their cases. This diminishes the integrity of the judicial branch of government.

As I believe the majority has today dramatically tilted the scales of justice in favor of criminal defendants for no good or beneficial reason whatsoever, I respectfully dissent.

Justices MEYER and WEBB join in this dissenting opinion.

Justice MEYER dissenting.

I join the well-reasoned dissenting opinion of Justice Mitchell, and wish to add the following.

The majority dismisses the very recent United States Supreme Court case, *Illinois v. Krull*, 480 U.S. ---, 94 L.Ed. 2d 364 (1987), as a 5 to 4 decision which fails to address the "judicial integrity" justification for the exclusionary rule. In my view, this cavalier dismissal is a serious error. As a practical matter, the United States Supreme Court frequently divides rather sharply on hotly debated issues such as this one. *See, e.g., United States v. Leon*, 468 U.S. 897, 82 L.Ed. 2d 677 (1984) (6 to 3); *United States v. Havens*, 446 U.S. 620, 64 L.Ed. 2d 559 (1980) (5 to 4); *Michigan v. DeFillipo*, 443 U.S. 31, 61 L.Ed. 2d 343 (1979) (6 to 3). It is unwise to ignore the teachings of the majority opinion in such cases.

In my view, the case before the Court today is indistinguishable from *Krull*. There, a detective searched an automobile wrecking yard under authorization of a section of the Illinois Vehicle Code granting police officers wide latitude to make warrantless inspections of the records and premises of automobile parts dealers. The statute was later found to be unconstitutional. Here, the SBI agent and assistant district attorney made application for a nontestimonial identification order requesting that, among other things, a blood sample be taken from defendant. The order was improperly issued, since under *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977), article 14 of chapter 15A of the North Carolina General Statutes does not apply to an in-custody accused. In *Krull*, the United States Supreme Court held that its decision in *United States v. Leon*, 468 U.S. 897, 82 L.Ed. 2d 677, controlled the facts before it. Under *Leon*, the exclusionary rule does not apply to evidence obtained by a police officer who acts in objective-

State v. Carter

ly reasonable reliance on a search warrant issued by a neutral magistrate that is later found to be defective. *Id.* at 922, 82 L.Ed. 2d at 698; *see* Note, *Illinois v. Krull: Extending the Fourth Amendment Exclusionary Rule's Good Faith Exception to Warrantless Searches Authorized by Statute,* 66 N.C.L. Rev. 781, 784 (1988). In *Krull,* the Supreme Court encountered no problems in analogizing the situation in which a police officer acts in reasonable reliance on an unconstitutional *warrant* to one in which he acts under the authority of what turns out to be an unconstitutional *statute.* So it should be in the case before this Court. Here we have a law enforcement officer acting in objectively reasonable reliance upon an order issued by a judge which was later found to have been improperly issued. If this Court followed *Krull,* the evidence deduced from the blood sample drawn from defendant would be properly admissible.

As the majority points out, when interpreting the Federal Constitution, we adopted the *Leon* holding and extended it to a case not involving a defective search warrant in *State v. Welch,* 316 N.C. 578, 342 S.E. 2d 789 (1986). In *Welch,* this Court held that the obtaining of a blood sample from an in-custody defendant by use of a nontestimonial order was an unreasonable search and seizure under the United States Constitution, but that since the officers acted in good faith in obtaining the blood through the nontestimonial order, the evidence need not be excluded. *State v. Welch,* 316 N.C. 578, 342 S.E. 2d 789. Under the logic of *Welch,* this Court should hold that the evidence derived from the blood drawn in this case should also not be suppressed since the seizure was in good faith. This is especially so since the samples were obtained from the defendant in the case *sub judice* before this Court's decision in *Welch* went down. The failure of the majority to give this case the same treatment as *Welch* is the worst sort of judicial arbitrariness.

The State here, in obtaining a nontestimonial order and in making the minor intrusions required to draw blood or get pubic and head hair samples, was acting in objectively reasonable reliance upon an order issued by a judge pursuant to statutory authority. *See, e.g., State v. Kuplen,* 316 N.C. 387, 343 S.E. 2d 793 (1986); *State v. Young,* 317 N.C. 396, 346 S.E. 2d 626 (1986). Logic demands that the good faith exception to the exclusionary rule be

properly extended to apply to the facts in the case before us today.

This Court ought not, on the basis of state constitutional law, reject the good faith exception to the federal exclusionary rule enunciated in *United States v. Leon*, 468 U.S. 897, 82 L.Ed. 2d 677, and *Massachusetts v. Sheppard*, 468 U.S. 981, 82 L.Ed. 2d 737 (1984). The law of search and seizure under the North Carolina Constitution should be interpreted as being no more restrictive than the fourth amendment to the United States Constitution. Article I, section 20 of the Constitution of North Carolina has generally been read as being the functional equivalent of the fourth amendment. *See State v. Kornegay*, 313 N.C. 1, 326 S.E. 2d 881; *State v. Arrington*, 311 N.C. 633, 319 S.E. 2d 254 (1984). In interpreting article I, section 20, this Court has generally relied on United States Supreme Court decisions on the fourth amendment as persuasive authority. *See, e.g., State v. Arrington*, 311 N.C. 633, 319 S.E. 2d 254.

As stated in *State v. Vestal*, 278 N.C. 561, 577, 180 S.E. 2d 755, 766 (1971), "there is no variance between the law of this State as declared by the decisions of this Court . . . and the requirements of the Fourth Amendment as interpreted by the Supreme Court of the United States." *See also State v. Kornegay*, 313 N.C. 1, 326 S.E. 2d 881 (1985). In *State v. Hendricks*, 43 N.C. App. 245, 258 S.E. 2d 872 (1979), *cert. denied*, 299 N.C. 123, 262 S.E. 2d 6 (1980), our Court of Appeals stated:

> Though the language in the North Carolina Constitution (Article I, Sec. 20), providing in substance that any search or seizure must be "supported by evidence," is markedly different from that in the federal constitution, there is no variance between the search and seizure law of North Carolina and the requirements of the Fourth Amendment as interpreted by the Supreme Court of the United States.

*Id.* at 251-52, 258 S.E. 2d at 877.

There is no reason, compelling or otherwise, for this Court to find there to be different exclusionary standards under the North Carolina Constitution than the United States Constitution. A dual set of rules and exclusionary standards will create a burdensome set of highly sophisticated rules which in no way furthers the ob-

jectives of the fourth amendment or article I, section 20 of the North Carolina Constitution. As pointed out in another context:

> "[T]he exclusionary rule[] is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.'"

*New York v. Belton*, 453 U.S. 454, 458, 69 L.Ed. 2d 768, 773-74, *reh'g denied*, 453 U.S. 950, 69 L.Ed. 2d 1036 (1981) (quoting LaFave, *"Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma*, 1974 Sup. Ct. Rev. 127, 141).

Since the search and seizure portions of the North Carolina Constitution have heretofore been interpreted in light of the United States Constitution, I believe that the majority has grievously erred in ignoring the rationale of *Illinois v. Krull*, 480 U.S. ---, 94 L.Ed. 2d 364, and instead creating different exclusionary rules depending upon whether the state or federal Constitutions are invoked by a defendant making a suppression motion.

Justices MITCHELL and WEBB join in this dissenting opinion.