# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 30, 2015 Session Heard at Nashville

## STATE OF TENNESSEE v. CORRIN KATHLEEN REYNOLDS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 99372     Steven Wayne Sword, Judge**

---

**No. E2013-02309-SC-R11-CD – Filed November 3, 2016**

---

SHARON G. LEE, J., dissenting.

I agree with the Court's conclusion that the warrantless blood draw violated Ms. Reynolds' right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. I dissent from the Court's decision to excuse these constitutional violations by adopting a good-faith exception to the exclusionary rule. The adoption of this exception for a constitutional violation erodes our citizens' rights to be free from unreasonable searches and seizures as guaranteed by the United States and Tennessee Constitutions. Therefore, I would hold that the test results of Ms. Reynolds' warrantless blood draw must be suppressed. Moreover, given the unusual facts of this case, the adoption of a good-faith exception for a constitutional violation based on an officer's good-faith reliance on binding judicial precedent, as set forth in *Davis v. United States*, 564 U.S. 229, 241 (2011), is ill-conceived for many reasons.

First, as the Court discusses, courts adopting a good-faith exception have concluded that the primary interest served by the exclusionary rule is deterring police misconduct. *See United States v. Leon*, 468 U.S. 897, 916 (1984). However, I agree with the concerns expressed by other courts that adopting a good-faith exception in cases involving constitutional error undermines the integrity of the judicial process. *See, e.g.*, *State v. Marsala*, 579 A.2d 58, 59 (Conn. 1990); *State v. Guzman*, 842 P.2d 660, 667 (Idaho 1992); *State v. Gutierrez*, 863 P.2d 1052, 1068 (N.M. 1993). In discharging our duty to protect citizens' constitutional guarantees, we have, in some circumstances, interpreted our Tennessee Constitution coextensively with the United States Constitution. Yet, we are free to extend greater protections than those afforded under the United States Constitution. Under the facts of this case, we should afford our citizens greater protection against unreasonable searches than is provided by the United States Constitution.

Second, by its decision, the Court is sanctioning the officer's invasive act of taking a sample of Ms. Reynolds' blood without a warrant and in violation of her constitutional rights. In doing so, the Court has created a category of cases in which police officers may violate constitutional rights with no consequences. Justice Sandra Day O'Connor, in her dissent in *Illinois v. Krull*, 480 U.S. 340 (1987), where the United States Supreme Court adopted a good-faith exception for reasonable reliance upon legislative acts later found to be unconstitutional, wisely observed that the exception allows a "grace period . . . during which the State is permitted to violate constitutional requirements with impunity." *Id.* at 361. Although the Court's reasoning in Ms. Reynolds' case is not based on *Krull*, Justice O'Connor's concerns are applicable. The police officer did not obtain a warrant before the blood draw, and there was no proof of any exigent circumstances. Under the Court's decision, the State nonetheless will be allowed to use the results of the warrantless blood draw as evidence against Ms. Reynolds. Moreover, the State will receive a "grace period" based on the good-faith exception to use evidence obtained in violation of the United States and Tennessee Constitutions in all other cases pending at the time the decision was announced in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013).

Third, the Court's decision treats Ms. Reynolds differently than the defendants in *McNeely* and *Aviles v. State*, 443 S.W.3d 291 (Tex. Ct. App. 2014). In *McNeely*, a Missouri police officer stopped Tyler McNeely's truck for exceeding the speed limit and repeatedly crossing the center line. *McNeely*, 133 S. Ct. at 1556. The officer observed that Mr. McNeely's breath smelled of alcohol, he had bloodshot eyes and slurred speech, and he appeared unsteady on his feet when getting out of his truck. He admitted to the officer he had consumed a "couple of beers." Mr. McNeely performed poorly on field sobriety tests and refused a breath test. *Id.* at 1556–57. The officer arrested him and took him to the station house where he again refused to take a breath test. *Id.* at 1557. Mr. McNeely was taken to a hospital where, over his objection, a blood sample was taken. The officer made no effort to get a warrant. Mr. McNeely was charged with driving while intoxicated. The trial court suppressed the results of the blood test based on the officer's failure to obtain a warrant and the lack of exigent circumstances. The Missouri Supreme Court affirmed. The United States Supreme Court held that in drunk driving cases, the natural dissipation of alcohol in the bloodstream does not constitute a per se exigency to justify conducting a blood test without a warrant. *Id.* at 1563. Notably, the United States Supreme Court did not apply the good-faith exception it created in *Davis* to excuse this illegal search. The blood test results were suppressed. *Id.* at 1568.

Similarly, in *Aviles*, 443 S.W.3d at 292, a police officer in Texas twice saw a truck driven by Antonio Aviles veer across several lane markers. The officer stopped the truck and saw that Mr. Aviles had bloodshot eyes, slurred speech, and was unsteady on his feet as he got out of the truck. Mr. Aviles showed signs of intoxication on field sobriety tests. After arresting Mr. Aviles for driving while intoxicated ("DWI"), the officer discovered Mr. Aviles had two prior DWI convictions. Mr. Aviles refused to give a breath or blood

sample for testing. Based on a section of the Texas Transportation Code that makes testing mandatory for a person with a prior DWI conviction, the officer required Mr. Aviles to submit to a blood test.[1] The trial court denied Mr. Aviles' motion to suppress the test results. He pleaded nolo contendere to the DWI charge and appealed. The Texas Court of Appeals affirmed, and the Texas Court of Criminal Appeals denied Mr. Aviles' petition for review. The United States Supreme Court granted Mr. Aviles' petition and vacated the trial court's decision in light of *McNeely*. *Id.* at 292–93. On remand, the Texas Court of Appeals found that the blood sample was taken without a warrant, there were no exigent circumstances, and the statutory mandatory blood draw was not a permissible exception to the warrant requirement. *Id.* at 294. The warrantless blood draw violated Mr. Aviles' rights under the Fourth Amendment, and the results from the blood test were suppressed.

Like the drivers in *McNeely* and *Aviles*, Ms. Reynolds was subjected to a warrantless blood draw. After being seriously injured in a traffic accident, Ms. Reynolds was taken by air ambulance to the hospital. One other person was injured, and two people died in the accident. The officer neither witnessed the accident nor saw Ms. Reynolds driving the vehicle. He was dispatched to the hospital to obtain a blood sample from Ms. Reynolds and another person injured in the accident. According to the officer, the blood draw was mandatory. Tennessee Code Annotated section 55-10-406(f)(1) provides that, when an officer has probable cause to believe the driver of a vehicle involved in an accident resulting in the injury or death of another has committed a violation of the driving under the influence statute, then the officer "shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood." Ms. Reynolds did not consent to the test and could not withdraw her implied consent. There was no proof of any exigent circumstances, and the officer did not obtain a warrant. The trial court granted Ms. Reynolds' motion to suppress, and the Court of Criminal Appeals reversed. While recognizing that the warrantless blood draw violated Ms. Reynolds' right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee

---

[1] Section 724.012(b)(3)(B) states:

> A peace officer shall require the taking of a specimen of the person's breath or blood . . . [if] at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person . . . on two or more occasions, has been previously convicted of or placed on community supervision for an offense under Section 49.04, 49.05, 49.06 or 49.065 Penal Code, or an offense under the laws of another state containing elements substantially similar to the elements of an offense under those sections.

Tex. Transp. Code Ann. § 724.012(b)(3)(B).

Constitution, the Court's ruling today allows for the admission of the blood test results under a good-faith exception that was not applied by the courts in *McNeely* or *Aviles.*

Fourth, assuming I concurred in the adoption of a good-faith exception for a constitutional violation based on good-faith reliance on binding judicial precedent, I would not apply it here. The Supreme Court in *McNeely* did not overrule its previous decision in *Schmerber v. California*, 384 U.S. 757 (1966). It merely clarified it. As the Court recognizes, after *Schmerber* was decided, there was considerable disagreement about its meaning and scope. Moreover, the language in *Schmerber* indicates it was based on the particular facts presented, and the Supreme Court reached its conclusion "[g]iven these special facts." *Id.* at 771.

In addition to this uncertainty, this Court never interpreted *Schmerber* as establishing a per se rule that the dissipation of alcohol always results in the finding of exigent circumstances. Although cases decided by the Court of Criminal Appeals cited language from *Schmerber* that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, these cases do not rise to the level of "binding judicial precedent." In *State v. Humphreys*, 70 S.W.3d 752, 762–63 (Tenn. Crim. App. 2001), for example, the Court of Criminal Appeals upheld the admissibility of blood test results based on the defendant's consent to the blood test. An officer observed the defendant erratically operating a vehicle on a public road. *Id.* at 756. The officer turned on the blue lights, followed the vehicle, and observed the vehicle again weave back and forth across the roadway. When he stopped the vehicle, the officer smelled a strong odor of alcohol and saw the defendant was slumped forward, his eyes red and watery, his speech slurred, and he appeared sleepy or sedated. *Id.* at 757. The defendant did not perform well on field sobriety tests and was arrested. The defendant consented to a blood test, signed the implied consent form, and was transported to a hospital where a sample of his blood was taken. Before trial, the defendant moved to suppress the results of the blood test asserting his consent was not voluntary. *Id.* at 758. The trial court found that his consent was voluntary, and the Court of Criminal Appeals affirmed on that basis. *Id.* at 759–60. In dicta, the Court of Criminal Appeals, citing *Schmerber*, noted that, since "evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement." *Id.* at 760–61.[2] Given the prevailing confusion surrounding *Schmerber*, the Court of Criminal Appeals' dicta did

---

[2] The opinion cited *State v. Janosky*, M1999-02574-CCA-R3-CD, 2000 WL 1449367 (Tenn. Crim. App. Sept. 29, 2000), an unpublished opinion written by the author of *Humphreys*, which quoted the same exigent circumstances language. *Janosky*, however, involved the admissibility of a breath test taken with the defendant's consent. *Id.* at *3. Thus, the issue before the trial court was not the existence of exigent circumstances, but whether the consent was voluntary.

not rise to the level of "binding judicial precedent," particularly for the purpose of adopting a good-faith exception under article I, section 7 of the Tennessee Constitution.[3]

Finally, I am not alone in my concerns regarding the adoption of a good-faith exception for violations of Fourth Amendment protections. Some state courts have declined to adopt the *Leon* good-faith exception because it erodes the constitutional rights of its citizens or otherwise conflicts with state statutory or constitutional law.[4] At least two state courts have rejected the *Davis* good-faith exception. In *Brown v. State*, 767 S.E.2d 299, 302 (Ga. Ct. App. 2014), the Georgia Court of Appeals did not apply a good-faith exception, relying on the Georgia Supreme Court's decision in *Gary v. State*, 422 S.E.2d 426, 429 (Ga. 1992), which recognized that the court has the power to impose higher standards on searches and seizures than required by the United States Constitution. In *McClintock v. State*, 480 S.W.3d 734, 742 (Tex. Ct. App. 2015), the court declined to

---

[3] The Court notes that "[t]he State urges us to adopt the good-faith exception articulated in *Davis* and points out, correctly, that courts in several other jurisdictions have adopted [the *Davis*] good-faith exception and it has been applied to prevent the exclusion of evidence obtained from warrantless blood draws conducted prior to *McNeely*." (Footnotes omitted). Only five of the thirteen cases cited in footnote 22 actually involved warrantless blood draws. Moreover, in those cases, the courts emphasized that the binding judicial precedent in those jurisdictions clearly permitted warrantless blood draws under the exigent circumstances exception. Thus, these cases are distinguishable.

[4] *See Marsala*, 579 A.2d at 59 (concluding that the *Leon* good-faith exception is incompatible with the Connecticut Constitution); *Dorsey v. State*, 761 A.2d 807, 820 (Del. 2000) (finding that there can be no good-faith exception when the probable cause requirement in the Delaware Constitution is not met); *Gary v. State*, 422 S.E.2d 426, 429 (Ga. 1992) (holding that based on the unequivocal language of Georgia's statutory exclusionary rule, "adopting the *Leon* good-faith exception would be tantamount to judicial legislation"); *State v. Guzman*, 842 P.2d 660, 677 (Idaho 1992) (refusing to "adhere to a policy of sheepishly following in the footsteps of the [United States] Supreme Court in the area of state constitutional analysis" and being convinced that *Leon* is ill-conceived and cannot be reconciled with article 1, section 17 of the Idaho Constitution); *State v. Cline*, 617 N.W.2d 277, 290 (Iowa 2000) (concluding that the adoption of a good-faith exception would only encourage lax practices by government officials in all three branches of government), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601 (Iowa 2001); *State v. Canelo*, 653 A.2d 1097, 1102 (N.H. 1995) (holding that a good-faith exception is incompatible with the guarantees of the New Hampshire Constitution); *State v. Novembrino*, 519 A.2d 820, 857 (N.J. 1987) (declining to adopt the *Leon* good-faith exception because it "would tend to undermine the constitutionally guaranteed standard of probable cause, and in the process disrupt the highly effective procedures employed by our criminal justice system to accommodate that constitutional guarantee without impairing law enforcement . . . ."); *Gutierrez*, 863 P.2d at 1068 (holding that the exclusionary rule is incompatible with the constitutional protections of the New Mexico Constitution); *State v. Carter*, 370 S.E.2d 553, 562 (N.C. 1988) (concluding that the public policy of the state is to exclude evidence obtained in violation of the North Carolina Constitution); *Commonwealth v. Edmunds*, 586 A.2d 887, 903 (Pa. 1991) (declining to apply the *Leon* good-faith exception because it undermines state constitutional provisions and rules of criminal procedure); *State v. Oakes*, 598 A.2d 119, 126–27 (Vt. 1991) (rejecting the *Leon* good-faith exception for state constitutional violations); *State v. Afana*, 233 P.3d 879, 886 (Wash. 2010) (en banc) (finding a good-faith exception incompatible with the "nearly categorical exclusionary rule" under the Washington Constitution).

adopt the *Davis* good-faith exception because it was inconsistent with the provisions of the Texas statutory exclusionary rule.

Drunk driving is a serious problem and threatens the lives of innocent people. However, to ensure the protection guaranteed to our citizens by article I, section 7 of the Tennessee Constitution, to maintain a remedy for violations of those protections, and to promote judicial integrity and fairness, this Court should decline to adopt the *Davis* good-faith exception to the exclusionary rule. Although the United States Supreme Court has adopted a good-faith exception, we have the authority to provide the citizens of our state with greater protections, and I submit we should do so in this case. As Chief Justice John Marshall so eloquently stated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."

For these reasons, I respectfully dissent.

_____
SHARON G. LEE, JUSTICE