LIBERTARIAN PARTY OF NORTH CAROLINA, SEAN HAUGH, as Executive Director of the party; PAMELA GUIGNARD and RUSTY SHERIDAN, as Libertarian candidates for Mayor of Charlotte, North Carolina; JUSTIN CARDONE and DAVID GABLE, as Libertarian candidates for Charlotte City Council; RICHARD NORMAN and THOMAS LEINBACH, as Libertarian candidates for Winston-Salem City Council; and JENNIFER SCHULZ as a registered voter, Plaintiffs, and THE NORTH CAROLINA GREEN PARTY; ELENA EVERETT, as Chair and KAI SCHWANDES, as Co-Chair of the party; NICHOLAS TRIPLETT, as a prospective North Carolina Green Party candidate for public office; HART MATTHEWS and GERALD SURH, as members of the party and qualified voters, Intervenors v. STATE OF NORTH CAROLINA; ROY COOPER, Attorney General of North Carolina; STATE BOARD OF ELECTIONS; and GARY O. BARTLETT, as Executive Director of the State Board, Defendants

No. COA08-1413

(Filed 20 October 2009)

## 1. Appeal and Error— mootness—ballot requirements for new parties

An appeal in a challenge to the constitutionality of statutes concerning the requirements for a political party to appear on the ballot was not moot even though plaintiffs had obtained sufficient signatures on a petition to regain recognition as a political party. A political party must continue to meet the statutory requirements in order to retain its recognition and, if it fails to do so by the deadline, there would not be enough time before the next election to fully litigate the matter.

## 2. Appeal and Error— preservation of issues—arguments not advanced—authorities not cited

Certain arguments concerning the constitutionality of the qualification requirements for a political party to be on the ballot were deemed abandoned where arguments were not advanced nor relevant authority cited.

## 3. Elections— ballot requirements—not unconstitutional— compelling state interests

A statute concerning the requirements for a political party to be on the ballot in North Carolina implicated rights under the North Carolina Constitution as well as fundamental rights protected by parallel provisions in the federal constitution. There is no reason to determine that the State of North Carolina's interest in regulating the administration of its elections under the North Carolina Constitution is less compelling than the interest all

states have in regulating the administration of elections under the federal Constitution.

**4. Elections— ballot requirements—not unconstitutional— narrowly tailored state interests**

The trial court did not err by holding constitutional a statute requiring a new political party to present a petition with registered voter signatures equaling two percent of those who voted in the last gubernatorial election to gain access to the ballot. Although appellants argued that the petition requirement is not narrowly tailored to meet the State's compelling interest, its unconstitutionality was not shown clearly, positively, and unmistakably beyond a reasonable doubt.

Judge CALABRIA concurring in part and dissenting in part.

Appeal by plaintiffs and intervenors from order entered 27 May 2008 by Judge Robert H. Hobgood in Wake County Superior Court. Heard in the Court of Appeals 20 April 2009.

*Tharrington Smith, L.L.P., by Kenneth A. Soo and Adam S. Mitchell, for plaintiffs-appellants.*

*Elliot Pishko Morgan, P.A., by Robert M. Elliot, Cooperating Attorney for the American Civil Liberties Union of North Carolina Legal Foundation, and American Civil Liberties Union of North Carolina Legal Foundation, by Katherine Lewis Parker, for intervenors-appellants.*

*Roy Cooper, Attorney General, by Alexander McC. Peters, Susan K. Nichols, Karen E. Long, Special Deputy Attorneys General, for defendants-appellees.*

MARTIN, Chief Judge.

Plaintiffs ("plaintiffs-Libertarians") and intervenors ("intervenors-Greens") appeal from the trial court's determination that N.C.G.S. §§ 163-96(a)(1)-(2) and 163-97.1 do not violate Article I, Sections 1, 10, 12, 14, and 19, or Article VI, Sections 1 and 6, of the North Carolina Constitution. For the reasons stated, we affirm.

The parties stipulate to the following facts:

1. Historically, states, including North Carolina, have imposed requirements on political parties to gain and retain recognition for their parties and their affiliated candidates.

2. To gain recognition in North Carolina, a political party has been required to submit a petition with the signatures of a number of registered voters supporting the recognition of that party; once a party has obtained recognition as a political party, its candidates have been listed on ballots throughout North Carolina.

3. From 1935 through 1981, the North Carolina signature requirement was 10,000 registered voters. North Carolina Code of 1935 § 5913.

. . . .

8. In 1983, the General Assembly increased the number of registered voter signatures required for recognition of a new political party . . . to two percent of the number who voted in the last gubernatorial election. 1983 Sess. Laws C. 576, § 1. Parties who are seeking recognition as political parties in North Carolina may begin gathering these signatures as soon as the gubernatorial election is over.

9. For the 2008 election, a party must submit 69,734 signatures from registered voters in order to gain recognition as a political party pursuant to N.C.G.S. § 163-96. These signatures must be submitted to the State Board of Elections by the first day of June.

. . . .

11. In order to retain recognition, a political party has historically been required to receive a threshold percentage of the votes cast statewide in the most recent gubernatorial or presidential election.

12. From 1935 to 1949, the ballot retention requirement was 3% of the statewide vote. North Carolina Code of 1935 § 5913.

13. In 1948, the States Right Party polled 8.8% of the vote.

14. In the next legislative session, the General Assembly raised the ballot retention requirement to 10% of the statewide vote.

15. Only one party other than the Democratic or Republican Party, the American Party in 1968, has ever met the 10% requirement. The Democratic and Republican Parties are the only two political parties to maintain continuous recognition since the enactment of N.C.G.S. §§ 163-96 and -97.

16. Effective January 1, 2007, after the filing of this action on September 21, 2005, the General Assembly amended N.C.G.S. § 163-96 to lower the retention requirement to 2%. 2006 Sess. Laws C. 234, §§ 1 and 2.

17. Once a political party is officially recognized, under § 163-96 its candidate must receive at least 2% of the statewide vote for governor or president for the party to remain officially recognized and for its candidates to be listed on the ballot for any office anywhere in the state. Thus, even if candidates of the party receive more than two percent of the vote in a particular city or county, they cannot be listed on the ballot and their party identified in ballots in that community if the party did not receive two percent of the vote statewide.

. . . .

38. Persons desiring to get on the ballot in North Carolina can also qualify as unaffiliated candidates pursuant to N.C.G.S. § 163-122 and as write-in candidates pursuant to N.C.G.S. § 163-123, though in neither circumstance will the candidate's political party appear with a party label. N.C.G.S. § 163-122 requires unaffiliated candidates for statewide office to submit signatures of registered voters equal to two percent of the voters who voted in the most recent gubernatorial election; for district or local offices, signatures equal to four percent of the registered voters in that district or locality must be submitted. N.C.G.S. § 163-123 requires write-in candidates for statewide office to submit 500 signatures of registered voters.

The parties further stipulate that the Libertarian Party of North Carolina has been in continuous existence since 1976, and has achieved recognition as a political party in North Carolina in most recent elections through the petition process set forth in N.C.G.S. § 163-96(a)(2). On the other hand, members of the North Carolina Green Party "have never met the state's petition requirements; have never gained recognition as a political party pursuant to [N.C.G.S.] § 163-96; and consequently, have never received the benefits of party recognition, including the right to run as candidates for public office under the Green Party label."

On 21 September 2005, plaintiffs-Libertarians filed a declaratory judgment action seeking to declare "the state statutes governing the recognition of political parties" in violation of several provisions of

the North Carolina Constitution. On 7 April 2006, intervenors-Greens filed a motion to intervene, which the trial court granted. On 26 February 2007, with the consent of defendants, plaintiffs-Libertarians and intervenors-Greens jointly filed a Second Amended Complaint asking the trial court to declare "the state statutes governing the recognition of political parties" in violation of the North Carolina Constitution under Article I, Sections 1, 10, 12, 14, and 19, and Article VI, Sections 1 and 6. Defendants filed their Answer to the Second Amended Complaint on 28 March 2007. Defendants moved the trial court to dismiss the action pursuant to North Carolina Rule of Civil Procedure 12(b)(6), and plaintiffs-Libertarians and intervenors-Greens filed a motion seeking summary judgment. The trial court denied both motions.

After considering the parties' arguments and evidence, the Wake County Superior Court concluded that plaintiffs-Libertarians and intervenors-Greens failed to overcome the presumption that the challenged statutes are constitutional, and further concluded that N.C.G.S. §§ 163-96(a)(1)-(2) and 163-97.1 do not violate Article I, Sections 1, 10, 12, 14 and 19, or Article VI, Sections 1 and 6, of the North Carolina Constitution. Accordingly, on 27 May 2008, the trial court entered judgment in favor of defendants. On 10 June 2008, plaintiffs-Libertarians and intervenors-Greens gave timely notice of appeal to this Court from the trial court's order.

---

[1] Defendants first raise the question of whether plaintiffs-Libertarians' appeal is moot because defendants claim that "any decision of this Court cannot have a practical effect on [plaintiffs-Libertarians'] status as a recognized political party." "[A] declaratory judgment should issue (1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Augur v. Augur*, 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002) (second alteration in original) (internal quotation marks omitted). When, during the course of litigation, " 'it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed, for courts will not entertain or proceed with a cause merely to determine abstract propositions of law.' " *Pearson v. Martin*, 319 N.C. 449, 451, 355 S.E.2d 496, 497 (quoting *In re Peoples*, 296 N.C. 109, 147-48, 250 S.E.2d 890, 912 (1978), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979)), *reh'g denied*, 319

N.C. 678, 356 S.E.2d 789 (1987); *see also Morris v. Morris*, 245 N.C. 30, 36, 95 S.E.2d 110, 114 (1956) ("[A] moot question is not within the scope of our Declaratory Judgment Act."). Nevertheless, when "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again," a case may be excepted from the mootness doctrine as being "capable of repetition, yet evading review." *See Crumpler v. Thornburg*, 92 N.C. App. 719, 723, 375 S.E.2d 708, 711 (alterations in original) (internal quotation marks omitted), *disc. review denied*, 324 N.C. 543, 380 S.E.2d 770 (1989).

As we mentioned above, the only method by which the Libertarian Party has qualified to be recognized as a political party for candidates appearing on a North Carolina ballot in elections through 2008 has been by satisfying the 2% petition requirement set forth in N.C.G.S. § 163-96(a)(2). N.C.G.S. § 163-96(a)(2) provides:

> [A political party within the meaning of the election laws of this State is a]ny group of voters which shall have filed with the State Board of Elections petitions for the formulation of a new political party which are signed by registered and qualified voters in this State equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor. Also the petition must be signed by at least 200 registered voters from each of four congressional districts in North Carolina. To be effective, the petitioners must file their petitions with the State Board of Elections before 12:00 noon on the first day of June preceding the day on which is to be held the first general State election in which the new political party desires to participate. The State Board of Elections shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chairman of the proposed new political party.

N.C. Gen. Stat. § 163-96(a)(2) (2007). Once a political party is recognized, it can retain its recognition only if, "at the last preceding general State election, [that political party] polled for its candidate for Governor, or for presidential electors, at least two percent (2%) of the entire vote cast in the State for Governor or for presidential electors." *See* N.C. Gen. Stat. § 163-96(a)(1) (2007). In the event that a recognized political party is unable to satisfy the 2% retention requirement set forth in N.C.G.S. § 163-96(a)(1), the political party "shall cease to

be a political party within the meaning of the primary and general election laws" of Chapter 163 of the General Statutes. *See* N.C. Gen. Stat. § 163-97 (2007). Thus, in order to be recognized as a political party, that group of voters must once again satisfy the 2% petition requirement set forth in N.C.G.S. § 163-96(a)(2).

In the present case, after failing to garner sufficient votes to retain its recognition following the 2004 general election—in which "the Libertarian Party candidate for Governor received 52,513 votes (1.5% of the total votes cast) and the Libertarian Party candidate for President received 11,731 (0.5% of the total votes cast)"—the Libertarian Party was de-certified by the State Board of Elections on 27 August 2005. However, following its de-certification, "five people collected more than 85,000 signatures for the Libertarian Party." As a result, "the Libertarian Party succeeded, following trial, in obtaining recognition as a political party for the 2008 election" in accordance with the 2% petition requirement of N.C.G.S. § 163-96(a)(2). Moreover, because the Libertarian Party's 2008 candidate for governor garnered over 2% of the statewide vote for that office in the 2008 election, the Libertarian Party generated sufficient votes to retain recognition as a political party through the next gubernatorial and presidential elections in 2012, in accordance with the 2% retention requirement of N.C.G.S. § 163-96(a)(1). It is because of this success in retaining its recognition as a political party until 2012 that defendants claim plaintiffs-Libertarians' appeal is moot.

Nevertheless, the Libertarian Party's current status as a recognized political party through the 2012 general election does not exempt it from its obligation to continue to satisfy the requirement of N.C.G.S. § 163-96(a)(1) in order to retain its recognition, or from its obligation to satisfy the 2% petition requirement of N.C.G.S. § 163-96(a)(2) in the event that it is unable to retain its recognition as a political party. Additionally, in the event that the Libertarian Party is required to satisfy the 2% petition requirement set forth in subsection (a)(2) but fails to do so by the June preceding the "first general State election in which the new political party desires to participate," *see* N.C. Gen. Stat. § 163-96(a)(2), the five or six months during which plaintiffs-Libertarians could bring a similar action challenging the constitutionality of the requirements of N.C.G.S. § 163-96(a)(1) and (2) would be too short to allow the matter to be fully litigated prior to the next election. Therefore, we hold that plaintiffs-Libertarians' appeal is not moot.

**[2]** Plaintiffs-Libertarians and intervenors-Greens assign as error the trial court's Conclusion of Law 17, in which the court concluded "[n]either the 2% retention requirement contained in [N.C.G.S.] § 163-96(a)(1) nor the 2% signature requirement contained in [N.C.G.S.] § 163-96(a)(2) violate Article I, §§ 1, 10, 12, 14 and 19, or Article VI, §§ 1 or 6, of the North Carolina Constitution." Appellants also assign as error the court's Conclusion of Law 18, in which the court concluded "[t]he provisions of [N.C.G.S.] § 163-97.1 do not violate Article I, §§ 1, 10, 12, 14 and 19, or Article VI, §§ 1 or 6, of the North Carolina Constitution." However, in their brief, with the exception of citing the constitutional provisions themselves, plaintiffs-Libertarians and intervenors-Greens have failed to advance an argument or cite relevant authority in support of their assertion that the statutes at issue implicate Article I, Sections 1 and 10, or Article VI, Sections 1 and 6, of the North Carolina Constitution. Additionally, plaintiffs fail to provide argument in support of their assignments of error which assert that N.C.G.S. §§ 163-96(a)(1) and 163-97.1 are unconstitutional under any of the aforementioned constitutional provisions. Therefore, since "[a]ssignments of error not set out in the appellant[s'] brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned," *see* N.C.R. App. P. 28(b)(6) (2009) (amended Oct. 1, 2009), we consider only whether N.C.G.S. § 163-96(a)(2) is violative of Article I, Sections 12 or 14, or of the "law of the land" clause of Section 19 of the North Carolina Constitution.

**[3]** Because the North Carolina Constitution "is a restriction of powers, and those powers not surrendered are reserved to the people to be exercised by their representatives in the General Assembly, so long as an act is not forbidden, the wisdom and expediency of the enactment is a legislative, not a judicial, decision." *Guilford Cty. Bd. of Educ. v. Guilford Cty. Bd. of Elections*, 110 N.C. App. 506, 510, 430 S.E.2d 681, 684 (1993) (citing *Wayne Cty. Citizens Ass'n v. Wayne Cty. Bd. of Comm'rs*, 328 N.C. 24, 29, 399 S.E.2d 311, 315 (1991)). "Therefore, the judicial duty of passing upon the constitutionality of an act of the General Assembly is one of great gravity and delicacy. This Court presumes that any act promulgated by the General Assembly is constitutional and resolves all doubt in favor of its constitutionality." *Id.* at 511, 430 S.E.2d at 684. "In challenging the constitutionality of a statute, the burden of proof is on the challenger, and the statute must be upheld unless its unconstitutionality clearly, positively, and unmistakably appears beyond a reasonable doubt or it cannot be upheld on any reasonable ground." *Id.*

**LIBERTARIAN PARTY OF N.C. v. STATE OF N.C.**

[200 N.C. App. 323 (2009)]

"Only [our Supreme] Court may authoritatively construe the Constitution and laws of North Carolina with finality." *Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 610, 304 S.E.2d 164, 170 (1983). Accordingly, "it must be remembered that in construing and applying our laws and the Constitution of North Carolina," neither this Court nor our Supreme Court is "bound by the decisions of federal courts, including the Supreme Court of the United States, although in our discretion we may conclude that the reasoning of such decisions is persuasive." *See State ex rel. Martin v. Preston*, 325 N.C. 438, 449-50, 385 S.E.2d 473, 479 (1989). "[W]e have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision." *State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988). For all "practical purposes, therefore, the only significant issue for this Court when interpreting a provision of our state Constitution paralleling a provision of the United States Constitution will always be whether the state Constitution guarantees additional rights to the citizen above and beyond those guaranteed by the parallel federal provision." *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998).

Federal courts have recognized that, "[a]s a rule, state laws that restrict a political party's access to the ballot always implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995), *cert. denied*, 517 U.S. 1104, 134 L. Ed. 2d 472 (1996); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 93 L. Ed. 2d 499, 504 (1986) ("Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively, and may not survive scrutiny under the First and Fourteenth Amendments." (citation omitted)). "That is because 'it is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech,' " *McLaughlin*, 65 F.3d at 1221 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 787, 75 L. Ed. 2d 547, 556 (1983)), and "because '[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes.' " *Id.* (alteration in original) (quoting *Williams v. Rhodes*, 393 U.S. 23, 31, 21 L. Ed. 2d 24,

31 (1968); citing *Norman v. Reed*, 502 U.S. 279, 288, 116 L. Ed. 2d 711, 722-23 (1992); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214, 93 L. Ed. 2d 514, 523 (1986)).

As we acknowledged above, we cannot construe the provisions of the North Carolina Constitution to accord the citizens of North Carolina any lesser rights than those which they are guaranteed by parallel federal provisions in the federal Constitution. *See Carter*, 322 N.C. at 713, 370 S.E.2d at 555. Therefore, we conclude that the challenged statute, which has been held to implicate fundamental rights protected by parallel provisions in the federal Constitution, *see McLaughlin*, 65 F.3d at 1221, also implicates the fundamental associational and expressive rights protected by Article I, Sections 12 and 14 of our Constitution, as well as by the "law of the land" clause of Article I, Section 19. *See* N.C. Const. art. I, § 12 ("The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances . . . ."); N.C. Const. art. I, § 14 ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . . ."); N.C. Const. art. I, § 19 ("No person shall be . . . in any manner deprived of his life, liberty, or property, but by the law of the land."); *see also Treants Enters., Inc. v. Onslow Cty.*, 94 N.C. App. 453, 462-63, 380 S.E.2d 602, 607 (1989) ("Our Supreme Court has held that the term 'law of the land,' as used in Article 1, Section 19 of the North Carolina Constitution, is synonymous with 'due process of law' as that term is applied under the Fourteenth Amendment to the United States Constitution." (internal quotation marks omitted)).

"[A] law which burdens certain explicit or implied fundamental rights must be strictly scrutinized. It may be justified only by a compelling state interest, and must be narrowly drawn to express only the legitimate interests at stake." *Treants Enters., Inc. v. Onslow Cty. (Treants 86)*, 83 N.C. App. 345, 351, 350 S.E.2d 365, 369 (1986) (internal quotation marks omitted), *disc. review denied*, 319 N.C. 411, 354 S.E.2d 730, *aff'd*, 320 N.C. 776, 360 S.E.2d 783 (1987).

The United States Supreme Court has continuously held that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442, 29 L. Ed. 2d·554, 562-63 (1971); *see also*

*Munro*, 479 U.S. at 194, 93 L. Ed. 2d at 505 ("States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot . . . . We reaffirm that principle today." (omission in original) (citation and internal quotation marks omitted)). Moreover, the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194-95, 93 L. Ed. 2d at 505. The Court determined that such a requirement "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* at 195, 93 L. Ed. 2d at 506. Instead, the Court concluded, "Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.* at 195-96, 93 L. Ed. 2d 506. In the present case, we see no reason to determine that the State of North Carolina has any less of a compelling interest in regulating the administration of its elections under the North Carolina Constitution than do all states in regulating the administration of elections under the federal Constitution.

**[4]** Accordingly, we are left only to determine whether the 2% petition requirement set forth in N.C.G.S. § 163-96(a)(2) is "narrowly drawn to express only the legitimate interests at stake." *See Treants 86*, 83 N.C. App. at 351, 350 S.E.2d at 369.

Plaintiffs-Libertarians and intervenors-Greens contend N.C.G.S. § 163-96(a)(2) is not the "least restrictive" means to serve the State's interest because it is "undisputed" that North Carolina had "no substantial problems with its ballots" when the statutory requirement for the creation of a political party was limited to 10,000 signatures between 1929 and 1981, and that, when North Carolina required only 5,000 signatures for ballot access in 1982, there were only four political parties that qualified for recognition on the ballot. We recognize that the General Assembly's former requirement that a group of voters collect the signatures of 10,000 registered voters is a considerably lower threshold than the State's current 2% petition requirement. Nevertheless, we cannot agree with appellants' assertion that, therefore, the State's current 2% petition requirement is not narrowly tailored to meet the State's compelling interest to ensure that, before a group is recognized by the State's election laws, a political party must

have some preliminary showing of a significant modicum of support among the current voting population of North Carolina.

When the Fourth Circuit considered the constitutionality of North Carolina's ballot access scheme under the federal Constitution, it determined that, "[w]hile all states condition ballot access on a showing of some preliminary [significant] modicum of support, it is beyond judicial competence to identify, as an objective and abstract matter, the precise numbers and percentages that would constitute the least restrictive means to advance the state's avowed and compelling interests." *McLaughlin*, 65 F.3d at 1222 (internal quotation marks omitted); *see also id.* (stating that "[t]his inquiry brings us into hazardous terrain"). For this reason, the Fourth Circuit adopted the approach taken by the Supreme Court in its review of such cases, and stated that "ballot access restrictions must be assessed as a complex whole[, whereby] . . . a reviewing court must determine whether 'the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights.' " *McLaughlin*, 65 F.3d at 1223 (second and third alterations in original) (quoting *Williams*, 393 U.S. at 34, 21 L. Ed. 2d at 33).

Under North Carolina's 2% petition requirement, voters who sign any such petition are not required to join or support the party if it is recognized, nor are voters required to vote for the candidates of said party in the event that the party is recognized on the ballot. Additionally, a group has more than three-and-a-half years to gather signatures for their petition—from the time one gubernatorial election ends until the June preceding the next gubernatorial election. *Cf. Jenness*, 403 U.S. at 433, 29 L. Ed. 2d at 557-58 (upholding as constitutional a Georgia ballot access statutory scheme which provided that a political party could be recognized upon the filing of a petition bearing the signature of registered voters "of not less than five percent [(5%)] of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking" and allowing the total time for circulating the petition of only 180 days).

We acknowledge, however, as did the Fourth Circuit in *McLaughlin*, that "[b]y directing that a political party cannot run a candidate for election to any office in the state unless it garners the petition support of 2% of the electorate," "the Libertarian Party (and potentially any other small party) has been forced to expend great effort to obtain statewide and local ballot access before each gubernatorial and presidential election only to lose that access *in toto* immediately thereafter." *See McLaughlin*, 65 F.3d at 1224. Neverthe-

less, the Fourth Circuit ultimately upheld North Carolina's statewide recognition and retention requirements for political parties—which were then 2% and 10%, respectively—as constitutional under the Supreme Court's decision in *American Party of Texas v. White*, 415 U.S. 767, 39 L. Ed. 2d 744, *reh'g denied*, 416 U.S. 1000, 40 L. Ed. 2d 777 (1974). *See McLaughlin*, 65 F.3d at 1225 (stating 'that, in *American Party*, the ballot access scheme in Texas—like the one in North Carolina—"did not provide a separate avenue for small parties to run candidates for local elections"); *see also id.* at 1225 n.11 (noting that "the Texas and North Carolina [ballot access laws] are indistinguishable" with regard to their respective reliance on "statewide, rather than more localized, voting figures as the benchmark for determining whether a party has a sufficient modicum of voter support").

While we agree with the Fourth Circuit's assessment that, under North Carolina's ballot access scheme, "the [S]tate inevitably burdens the associational rights of members of . . . small parties as well as the informational interests of all voters regardless of their party affiliation," *see McLaughlin*, 65 F.3d at 1225, we also agree with the Supreme Court that "associational rights" are "not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *See Munro*, 479 U.S. at 193, 93 L. Ed. 2d at 504. As we recognized above, "[t]he legislative department is the judge, within reasonable limits, of what the public welfare requires, and the wisdom of its enactments is not the concern of the courts." *State v. Warren*, 252 N.C. 690, 696, 114 S.E.2d 660, 666 (1960). "As to whether an act is good or bad law, wise or unwise, is a question for the Legislature and not for the courts—it is a political question." *Id.* Because we conclude that a legislative enactment "must be upheld unless its unconstitutionality clearly, positively, and unmistakably appears beyond a reasonable doubt or it cannot be upheld on any reasonable ground," *see Guilford Cty. Bd. of Educ.*, 110 N.C. App. at 511, 430 S.E.2d at 684, we hold that the trial court did not err when it concluded that N.C.G.S. § 163-96(a)(2) was not violative of Article I, Sections 12 or 14, or of the "law of the land" clause of Section 19 of the North Carolina Constitution.

Affirmed.

Judge STEELMAN concurs.

Judge CALABRIA concurs in part and dissents in part.

CALABRIA, Judge, concurring in part and dissenting in part.

I concur in the portions of the majority opinion holding that the claims of the Libertarian Party are not moot and applying strict scrutiny review to the instant case. However, I disagree with the majority's determination that N.C. Gen. Stat. §§ 163-96 and 163-97 ("the ballot access statutes") do not violate the North Carolina Constitution ("the State Constitution") and therefore, I must respectfully dissent from that portion of the majority opinion.

States remain free to interpret their own constitutions in any way they see fit, including constructions which grant a citizen rights where none exist under the Federal Constitution. *See Lowe v. Tarble*, 313 N.C. 460, 462, 329 S.E.2d 648, 650 (1985). Even where provisions of the State Constitution and Federal Constitution are identical, "we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision." *State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988)(citations omitted). In construing the State Constitution, this Court is not bound by the decisions of federal courts, including the United States Supreme Court. *State ex rel. Martin v. Preston*, 325 N.C. 438, 449-50, 385 S.E.2d 473, 479 (1989)(citations omitted).

"All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2.

> The will of the people as expressed in the Constitution is the supreme law of the land. In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.

*State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944) (internal citations omitted). Our State Constitution is not a grant of power. *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961). All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people

through their representatives in the Legislature is valid unless prohibited by that Constitution. *Id.*

Appellants bring their claims under Article I, §§ 1, 12, 14 and 19 of the State Constitution. Article I, § 1 provides that "all persons are created equal" and have the inalienable rights of "life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness"; § 12 contains the right of association ("The people have a right to assemble together . . ."); § 14 provides for freedom of speech; and § 19 includes the State Constitution's equal protection and due process clauses. Appellants also bring claims under Article I, Section 10, which provides that "[a]ll elections shall be free"; under Article VI, Section 1, which establishes the right of all voters to vote for candidates of their choice; and under Article VI, Section 6, which establishes the right of every citizen to run for office. Appellants' claims also implicate the right to vote, which our Supreme Court has called "one of the most cherished rights in our system of government, enshrined in both our Federal and State Constitutions." *Blankenship v. Bartlett,* —— N.C. ——, ——, —— S.E.2d ——, —— (2009).

These provisions lead to the undeniable conclusion that the rights infringed upon by the ballot access statutes are fundamental under the State Constitution. "[A] law which burdens certain explicit or implied 'fundamental' rights must be strictly scrutinized. It may be justified only by a 'compelling state interest,' and must be narrowly drawn to express only the legitimate interests at stake." *Treants Enterprises, Inc. v. Onslow Cty.,* 83 N.C. App. 345, 351, 350 S.E.2d 365, 369 (1986) (citations omitted). Thus, the ballot access statutes are subject to strict scrutiny review under the State Constitution.

A. Compelling Governmental Interest

The majority correctly holds that the State has a compelling interest in requiring some preliminary modicum of support before printing the name of a political party's candidate on the ballot. This allows the State to avoid confusion, deception, and even frustration of the democratic process at the general election. This interest has repeatedly been recognized as compelling by the United States Supreme Court. *See Jenness v. Fortson,* 403 U.S. 431, 442, 29 L. Ed. 2d 554, 562-63 (1971); *Anderson v. Celebrezze,* 460 U.S. 780, 788, 75 L. Ed. 2d 547, 557 (1983); *Munro v. Socialist Workers Party,* 479 U.S. 189, 193-94, 93 L. Ed. 2d 499, 505 (1986). There is no reason that this interest should not be considered equally compelling under the State Constitution.

### B.  Least Restrictive Means

The Fourth Circuit Court of Appeals in *McLaughlin v. North Carolina Bd. of Elections* held, "[w]hile all states condition ballot access on a showing of some 'preliminary modicum of support,' it is beyond judicial competence to identify, as an objective and abstract matter, the precise numbers and percentages that would constitute the least restrictive means to advance the state's avowed and compelling interests." 65 F.3d 1215, 1222 (4th Cir. 1995). Therefore, rather than determine whether the methods of the ballot access statutes are the least restrictive way to accomplish the State's purpose, this Court must instead determine whether "the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights." *Williams v. Rhodes*, 393 U.S. 23, 34, 21 L. Ed. 2d 24, 33 (1968). The *McLauglin* Court referred to this test as an assessment of the "complex whole." Using this test, the *McLaughlin* Court upheld the ballot access statutes under the United States Constitution. 65 F.3d at 1226. Because the State Constitution contains unique provisions regarding voting rights that are not contained in the United States Constitution, additional analysis of the ballot access statutes is necessary to determine if the "complex whole" in the instant case violates the State Constitution[1].

The people of the State of North Carolina chose to have a constitution which, in contrast to the United States Constitution, specifically governs suffrage and eligibility to office. Under the State Constitution, "[e]very person born in the United States and every person who has been naturalized, 18 years of age, and possessing the qualifications set out in this Article, shall be entitled to vote at any election by the people of the State, except as herein otherwise provided." N.C. Const. art. VI, § 1. Additionally, "[e]very qualified voter in North Carolina who is 21 years of age, except as in this Constitution disqualified, shall be eligible for election by the people to office." N.C. Const. art. VI, § 6. Under the State Constitution, a voter who is otherwise qualified for office can be disqualified in only three situations:

First, any person who shall deny the being of Almighty God.[2]

---

1. Although the majority procedurally limits its review to Article I, §§ 12, 14, and 19 of the State Constitution, a proper review of the "complex whole" necessarily requires examination of all relevant provisions of the State Constitution.

2. The Attorney General of this State has issued an opinion that this provision violates U.S. Const. amend. I. *See* Opinion of Attorney General to Mr. Clyde Smith, Deputy Secretary of State, 41 N.C.A.G. 727 (1972).

Second, with respect to any office that is filled by election by the people, any person who is not qualified to vote in an election for that office.

Third, any person who has been adjudged guilty of treason or any other felony against this State or the United States, or any person who has been adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, or any person who has been adjudged guilty of corruption or malpractice in any office, or any person who has been removed by impeachment from any office, and who has not been restored to the rights of citizenship in the manner prescribed by law.

N.C. Const. art. VI, § 8. In all other circumstances, the right of a qualified voter who is 21 years of age to run for election by the people is absolute.

"[A] constitution cannot be in violation of itself, and [] all constitutional provisions must be read *in pari materia*[.]" *Stephenson v. Bartlett*, 355 N.C. 354, 378, 562 S.E.2d 377, 394 (2002) (internal citations omitted). Reading these various provisions of the State Constitution *in pari materia*, "a serious problem is raised that has to be addressed." *McLaughlin*, 65 F.3d at 1223. The *McLaughlin* Court was particularly troubled by the fact that

North Carolina provides no means by which a small party can nominate a candidate for any office in the state unless it secures the petition support of 2% of the persons who voted in the previous gubernatorial election. That means, for instance, that the [appellants] cannot nominate candidates . . . without first meeting the requirements to qualify as a statewide party. Even had [one of appellants' candidates] for local or countywide office won her election, her ability to designate her party affiliation on the ballot for purposes of reelection would be conditioned on the party's ability to register support elsewhere. (She could, of course, run for reelection as an independent candidate. But she would then be obligated to identify herself as "unaffiliated" on her ballot access petition, N.C. Gen. Stat. § 163-22(b), and, if her petition succeeded, would appear on the general election in the column headed "Unaffiliated Candidates." § 163-140.) More generally, no party other than the Democrats and the Republicans can run a candidate in any election in the state in 1996 unless it submits a petition with 51,904 voters across the state (including at least 200

in each of four congressional districts)—even if that far exceeds the number of persons registered to vote for that office.

*Id.* at 1223-24. The *McLaughlin* Court also noted "the Supreme Court cautioned . . . it may be impermissible for a state to 'foreclose the development of any political party lacking the resources to run a statewide campaign.'" *Id.* at 1224 (quoting *Norman v. Reed*, 502 U.S. 279, 289, 116 L. Ed. 2d 711, 723 (1992)).

> The fact that *unaffiliated* candidates can be placed on the ballot for local, district, and county offices by submitting a petition with signatures from 4% of the registered voters in that area . . . does not necessarily relieve the problem. The Supreme Court has recognized that "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."

*Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 745, 39 L. Ed. 2d 714, 732 (1974)). Although the *McLaughlin* Court felt it could not overturn North Carolina's ballot access statutes without a more explicit holding from the United States Supreme Court, this Court is under no such constraint when analyzing the ballot access statutes under the State Constitution.

Although the State has a compelling interest in avoiding ballot confusion by requiring some preliminary modicum of support before printing the name of a political party's candidate on the ballot, the compelling interests of the people of North Carolina as explicitly delineated in the State Constitution are thwarted by the ballot access statutes.

Qualified voters under the State Constitution who are affiliated with third parties and wish to exercise their right, enshrined in the State Constitution, to be eligible for election to office by the people in conjunction with their fundamental rights to free speech and association, can only do so by going through the onerous process of collecting almost 70,000 signatures for statewide recognition of their party. This situation exists even if the third party candidate simply seeks election to a local office in a small town where the total number of voters falls far below 70,000. Even if a third party is able to expend the effort required to successfully meet this burden and gain ballot access, there is still a significant likelihood that such access will be lost, *in toto*, immediately following the subsequent election, forcing the third party to begin the petition gathering process anew.

The United States Supreme Court has recognized that "political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer*, 415 U.S. at 745, 39 L. Ed. 2d at 732. The State, in asserting its compelling interest in avoiding confusion, deception, and even frustration of the democratic process in the general election, fails to provide any basis, rational or otherwise, for why ballot access pursuant to the 4% local requirement for unaffiliated candidates pursuant to N.C. Gen. Stat. § 163-122 or the 500 vote write-in candidate provision of N.C. Gen. Stat. § 163-123 does not cause these ballot problems. The State instead asserts that allowing these same candidates the ability to identify their party on the ballot somehow has the potential to cause substantial problems. The treatment of unaffiliated and write-in candidates demonstrates that the State could regulate ballot access for political parties in a less restrictive way while still allowing the State to uphold its compelling interest.

North Carolina's 2% statewide requirements for both ballot access and ballot retention place too onerous a burden on the fundamental rights of members of third parties under the State Constitution. The State, by permitting ballot access under far less burdensome requirements for unaffiliated candidates, has proven that it can accomplish its compelling interest in ballot regulation in a less restrictive fashion. It is ultimately the role of the Legislature, rather than this Court, to determine a precise method of ballot access and/or retention that is permissible under the State Constitution. Our Supreme Court has recognized "our limitations in providing specific remedies for [constitutional] violations committed by other government branches in service to a subject matter . . . that is within their primary domain." *Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 645, 599 S.E.2d 365, 395 (2004). However, the ballot access statutes must, at the very least, allow both political parties and unaffiliated candidates equal access to the ballot.

An analysis of the "complex whole" under the State Constitution must include consideration of the unique voting rights contained in the State Constitution, the inability of political parties lacking the resources to run a statewide campaign to gain ballot access, and the ability of unaffiliated and write-in candidates to run for local office with far less than the 2% statewide requirement for political parties. An analysis that includes these items as part of the "complex whole" of the ballot access statutes leads to the conclusion that the ballot access statutes are too restrictive to survive strict scrutiny under the

State Constitution. I would hold that N.C. Gen. Stat. §§ 163-96 and 163-97 violate the State Constitution.