STATE OF NORTH CAROLINA v. DARRELL BOYD, DEFENDANT

No. COA10-25

(Filed 2 November 2010)

**1. Search and Seizure— motion to suppress—DNA sample**

The trial court did not err by denying defendant's motion to suppress a DNA sample taken from him while he was in custody in Ohio. Defendant's consent was voluntary even though he was unaware that the crimes for which he was being investigated were of a sexual nature. A reasonable person in defendant's position would have believed that the DNA could be used generally for investigative purposes.

STATE v. BOYD

[207 N.C. App. 632 (2010)]

**2. Jury— alleged juror misconduct—motion to replace juror denied**

The trial court did not err by denying defendant's motion to replace a juror. Nothing suggested that the juror had spoken with other jurors about her thoughts, shared a note addressed to the judge with anyone else, or participated in any kind of misconduct.

**3. Sentencing—prior record level—calculation error—new sentencing hearing**

The trial court erred in calculating defendant's prior record level and the matter was remanded for a new sentencing hearing. By failing to meet the requirements of N.C.G.S. § 15A-1340.14(f)(1)-(4), the State failed to meet its burden in proving that the convictions listed on defendant's prior record level worksheet existed at the time of sentencing. Further, the prosecutor's in-court statement and accompanying prior record level worksheet were insufficient to prove defendant's prior convictions without a stipulation.

Appeal by defendant from judgment entered 10 August 2009 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 17 August 2010.

*Attorney General Roy Cooper, by Special Deputy Attorney General Gerald K. Robbins, for the State.*

*Geoffrey W. Hosford for defendant-appellant.*

HUNTER, Robert C., Judge.

Darrell Boyd ("defendant") appeals from the trial court's order denying his motion to suppress and further claims that the trial court erred in: (1) denying his motion to replace a juror during trial, and (2) calculating his sentence. After careful review, we affirm the trial court's order denying defendant's motion to suppress and hold that the trial court did not err in denying defendant's motion to replace a juror. Because the trial court erred in calculating defendant's prior record level, we remand for a new sentencing hearing.

## Background

On the morning of 1 May 1998, "T.S.", a student at the University of North Carolina at Charlotte ("UNCC"), went to Wal-Mart and returned home at approximately 9:00 a.m. Her roommate left for work shortly thereafter. Suddenly, an African-American man wearing

a blue bandana that covered his face from the nose down entered her apartment and pointed a gun at her. The intruder forced T.S. into her bedroom, shut the blinds, and told her to shut the blinds in her roommate's bedroom as well. The man then tied her hands to the foot of her roommate's bed and proceeded to search through the apartment. The intruder returned, pointed the gun at T.S.'s head and threatened to kill her. The man asked T.S. if she would be willing to trade her life for sex. She replied, "yes." The intruder had sex with T.S. and then led her to the bathroom and instructed her to take a bath. The assailant then tied T.S. to her bed, and told her to give him a ten-minute head start before she called the police. At the police station several months later, T.S. looked at a picture of defendant and stated that defendant's eyes resembled the eyes of the man who had sex with her; however, she did not otherwise recognize defendant as the man who had attacked her. T.S. stated at trial that she did not know defendant and had never had consensual sex with him.

In May 1998, "J.J." was living in Charlotte and attending UNCC. On 14 May 1998, J.J. worked until about 6:00 p.m., came home, ate dinner, watched television, and went to sleep. When she turned off the light in her bedroom, she saw a man standing in the doorway. The intruder came toward J.J., tackled her, hit her in the face with his fist, and covered her head with bedcovers. The man bound J.J.'s hands with a belt from her bathrobe and had sex with her. The man made J.J. promise on her mother's life that she would not call the police after he left. The assailant then drew a bath for J.J. and told her to wash herself. He then left the apartment. J.J. did not identify defendant in court or by photographic lineup as the man who had sex with her. Like T.S., J.J. testified that she did not know defendant and had never had consensual sex with him.

Lab results showed that the DNA from biological material recovered during the examinations of T.S. and J.J. substantially matched the DNA sample provided by defendant. Defendant testified that he knew T.S. and J.J. and had engaged in consensual sex with both women.

On 25 June 2007, defendant was indicted on two counts of second-degree rape, three counts of second-degree sexual offense, first-degree burglary, one count of common law robbery, and one count of first-degree kidnapping in connection with the assault on J.J. On 9 July 2007, defendant was indicted on one count of felonious breaking and entering, one count of first degree kidnapping, four counts of first degree sexual offense, and four counts of first degree rape in

connection with the assault on T.S. On 3 August 2009, all of the charges were joined for trial.

Prior to trial, defendant filed a motion to suppress the DNA evidence taken from him while he was incarcerated in Ohio on unrelated charges. Defendant's DNA sample was taken at the request of a Charlotte detective who traveled to Ohio to talk with defendant. Defendant gave the DNA sample after being informed that it could exclude him from certain ongoing investigations. Specifically, defendant was told that the investigation concerned break-ins and assaults on women that occurred in Charlotte in 1998. Defendant acknowledged that he gave the DNA sample voluntarily by signing a document entitled "Consent for Non-testimonial Identification Procedure." Despite signing the consent form, defendant argued that his consent was not voluntarily given. The trial court denied defendant's motion to suppress.

During trial, a note was sent to the judge from juror one. The note requested permission for the jury to see a DVD that was shown by the State on the previous day, and also stated, "[t]he accent Mr. Boyd is using today is fabricated. I speak two other languages and I know the difference in accents. Therefore can we please play the CD that was shown yesterday afternoon?" The court questioned juror one about her ability to continue to listen to the remainder of the evidence before considering defendant's guilt or innocence, and juror one replied that she could. Defendant moved that juror one be replaced with an alternate; the court denied his motion.

At the close of the evidence, the trial court dismissed the common law robbery charge. The jury found defendant guilty of the remaining charges. At sentencing, the State argued that defendant had a prior record level of III. Defense counsel objected to the State's calculation and argued: "[T]he record is inaccurate. I believe the two charges from Ohio arose on the same day. There is one conviction. So his prior level as stated by the State is inaccurate." Defendant also argued that his 10 August 2009 prior record level worksheet contained an additional error. The worksheet included a conviction for "Trafficking Heroin" occurring on "11/8/09." This conviction date would have occurred approximately two months after defendant's sentencing in this case. The prior record level worksheet was the only evidence offered by the State to prove the prior convictions or dates of conviction. Based on the worksheet, the court ruled that defendant's prior record level was III. Defendant was sentenced to a mini-

mum of 336 months and a maximum of 413 months in prison. Defendant timely appealed to this Court.

Discussion

I. Motion To Suppress DNA Evidence

**[1]** Defendant first argues that the DNA sample taken from him while he was in custody in Ohio should have been suppressed because his consent to take the sample was not voluntary. More specifically, defendant argues that his consent to DNA sampling was obtained by "deceit and misrepresentation." Defendant claims that the detective who requested the sample never told him that he was under investigation for rape and other sexual assault charges. Defendant argues that the detective's failure to inform him of all the charges for which he was being investigated amounted to "blatant deception of [defendant in] the key circumstance that led to [his] submission of the saliva sample." Defendant further claims that this deception prevented his consent from being voluntary, and, accordingly, the State was required to obtain a warrant to take the DNA sample. Defendant argues that because there was no warrant, the DNA sample was an illegal search and seizure under both the United States Constitution and the North Carolina Constitution.

The standard of review for a motion to suppress evidence is whether the trial court's "findings of fact are supported by competent evidence and whether the findings support the court's conclusions of law." *State v. Barkley*, 144 N.C. App. 514, 520, 551 S.E.2d 131, 135-36, *appeal dismissed*, 354 N.C. 221, 554 S.E.2d 646 (2001). "The court's conclusions of law are fully reviewable on appeal." *Barkley*, 144 N.C. App. at 520, 551 S.E.2d at 136 (citation and quotation marks omitted).

Here, the trial court concluded as a matter of law that "Defendant freely, knowingly, intelligently, and voluntarily agreed to provide a DNA sample." Defendant argues that this conclusion of law is erroneous; however defendant does not argue that any of the trial court's findings of fact were not supported by competent evidence, and, consequently, the findings are binding on appeal. *State v. Carrouthers*, —— N.C. App.——, ——, 683 S.E.2d 781, 784 (2009).

The taking of genetic material from a person constitutes a search under the North Carolina Constitution and the United States Constitution. *State v. Carter*, 322 N.C. 709, 714, 370 S.E.2d 553, 556 (1988); *Schmerber v. California*, 86 S. Ct. 1826, 1835, 16 L. Ed. 2d 908, 919 (1966). While the genetic material taken was blood in *Carter* and

*Schmerber*, we see no distinction between the taking of blood and the taking of saliva for the purpose of DNA testing. "[U]nder our state constitution, a search warrant must be issued before [genetic material] can be obtained," absent an exception. *Carter*, 322 N.C. at 714, 370 S.E.2d at 556. Consent, when given voluntarily, is an exception to the warrant requirement. *Barkley*, 144 N.C. App. at 520, 551 S.E.2d at 135.

In order for consent to be valid it must be "voluntar[y]. To be voluntary the consent must be . . . 'freely and intelligently given,' . . . free from coercion, duress or fraud, and not given merely to avoid resistance." *State v. Little*, 270 N.C. 234, 239 154 S.E.2d 61, 65 (1967). "When, as here, the State seeks to rely upon defendant's consent to support the validity of a search, it has the burden of proving that the consent was voluntary." *State v. Morocco*, 99 N.C. App. 421, 429, 393 S.E.2d 545, 549 (1990). "Voluntariness is a question of fact to be determined from all of the surrounding circumstances." *Id.* at 429, 393 S.E.2d at 550 (citing *State v. Williams*, 314 N.C. 337, 344, 333 S.E.2d 708, 714 (1985)). In *Florida v. Jimeno*, 111 S. Ct. 1801, 1804, 114 L. Ed. 2d 297, 302 (1991), the Supreme Court stated that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

Defendant's claim that his consent was involuntary because the detective failed to tell him that he was being investigated for rape and other sexual assault charges is without merit. The present case is analogous in most respects to *Barkley* where the defendant argued that the trial court erred in denying his motion to suppress DNA evidence obtained by consent. 144 N.C. App. at 518, 551 S.E.2d at 134. The defendant claimed "that [while] he consented to have his blood drawn to exonerate himself in [a] murder investigation . . . the use of his blood to implicate him in [a kidnapping and rape] case violated his constitutional right to be free from unreasonable searches." *Id.* This Court concluded that "a reasonable person would have understood . . . that his blood analysis could be used generally for investigative purposes, and not exclusively for [one investigation]." *Id.* at 521, 551 S.E.2d at 135. Since the issue was one of first impression, this Court relied on analogous cases from other jurisdictions. *Id.* at 519, 551 S.E.2d at 135. For example, in *Bickley v. State*, 227 Ga. App. 413, 415, 489 S.E.2d 167, 170 (1997), the Georgia appellate court stated that "DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations." In

*People v. King*, 663 N.Y.S.2d 610, 614-15, 232 A.D.2d 111, 117-18 (1997), the New York appellate court reasoned that

> once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person.

The present case is arguably distinguishable from *Barkley* because the defendant in that case argued that "the use of the DNA analysis should have been limited by the *scope of his consent*," and the defendant in the present case argues that the detective's failure to inform him of all the crimes for which he was being investigated prevented his consent from being voluntary. *Barkley*, 144 N.C. App. at 520, 551 S.E.2d at 135 (emphasis added). We find this to be a distinction without a difference. Moreover, the Court in *Barkley* considered whether the defendant's consent was voluntarily given and held that it was voluntary, even though defendant was never informed that the DNA blood evidence might be used in other investigations. *Id.* at 520-21, 551 S.E.2d at 136. The trial court's conclusion of law, "[t]hat the Defendant freely, voluntarily, understandingly, and knowingly consented to having his blood withdrawn for investigative purposes on June the 11th, 1996" is almost identical to the conclusion of law made by the trial court in the present case. *Id.* at 520, 551 S.E.2d at 136. Here, the trial court's undisputed findings of fact establish that:

> 11. Immediately upon his arrival, Detective Armstrong identified himself as a law-enforcement officer and informed Defendant that he was investigating some break-ins that had occurred in 1998 in Charlotte, North Carolina, during which women had been assaulted.

> 12. Within five minutes of his arrival, Detective Armstrong had read Defendant his Miranda Rights, explained them to him and had him sign a form indicating he had been informed of his Miranda rights, understood them and was willing to talk with Armstrong and answer his questions.

> . . . .

> 16. Armstrong did not specifically tell Defendant that the assaults were sexual in nature.

17. Armstrong told Defendant that he needed Defendant's DNA sample to exclude him as a suspect in the break-ins.

18. Defendant consented to providing a DNA sample, signing a written document indicating his assent.

19. Defendant understood that he did not have to assent to giving the DNA sample.

20. Defendant understood that the results of any testing done on the DNA sample could be used against him in court.

We hold that these findings support the trial court's conclusion that defendant's consent was voluntary even though he was unaware that the assaults were of a sexual nature. "Once the [saliva] was lawfully [taken] from defendant's body, he no longer had a possessory interest in that [genetic material]." *Id.* at 520, 551 S.E.2d at 135. We further hold that a reasonable person in defendant's position would believe that the DNA could be used generally for investigative purposes. Consequently, we conclude that the trial court did not err in denying defendant's motion to suppress.

II. Denial of Defendant's Motion to Replace Juror One

[2] Defendant next argues that juror number one should have been excused after she sent a letter to the trial judge requesting to see a DVD that had been played the previous day in court and stated that she thought defendant's accent was fabricated. Defendant argues that the court's decision to deny his motion to dismiss the juror was an abuse of discretion. This argument is without merit.

The challenged juror sent the following letter to the trial judge:

The DA yesterday had a DVD CD with some sort of interview for testimony of Mr. Boyd. Can we play that? The accent Mr. Boyd is using today is fabricated. I speak two other languages and I know the difference in accents. Therefore can we please play the CD that was shown yesterday afternoon?

Defendant argues that the juror's actions constitute misconduct and that the court's failure to replace her deprived defendant of a fair and impartial jury.

A trial court's decision regarding removal of a juror for misconduct "will be reversed only where an abuse of discretion has occurred." *State v. Drake*, 31 N.C. App. 187, 190, 229 S.E.2d 51, 54 (1976) (citing *O'Berry v. Perry*, 266 N.C. 77, 145 S.E.2d 321 (1965)).

"A trial court's actions constitute abuse of discretion 'upon a showing that the actions 'are manifestly unsupported by reason' and 'so arbitrary that they could not have been the result of a reasoned decision.' " *State v. Williams*, 361 N.C. 78, 81, 637 S.E.2d 523, 525 (2006) (quoting *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998)). Determining whether juror misconduct has occurred "is primarily for the trial court whose decision will be given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991). Deference is given because "[m]isconduct is determined by the facts and circumstances in each case. The trial judge is in a better position to investigate any allegations of misconduct, question the witnesses and observe their demeanor, and make appropriate findings." *State v. Harris*, 145 N.C. App. 570, 576, 551 S.E.2d 499, 503 (2001). "An inquiry into possible misconduct is generally required only where there are reports indicating that some prejudicial conduct has taken place." *State v. Murillo*, 349 N.C. 573, 599, 509 S.E.2d 752, 767 (1998). Where there is a mere suspicion of misconduct, any subsequent investigation is within the discretion of the trial court. *Id.* Failure to "investigate and determine the alleged juror misconduct" may constitute error. *Drake*, 31 N.C. App. at 193, 229 S.E.2d at 55.

Here, while the letter sent from the juror questioned the authenticity of defendant's accent, it said nothing about her opinion concerning his involvement in the alleged rapes. Accordingly, this was not a report that prejudicial conduct had occurred. In fact, reading the note in its entirety supports the possibility that juror one requested the DVD in order to continue weighing defendant's testimony by comparing what she had heard in court to other statements made by defendant.

Despite only being presented with a note that provided a suspicion of potential misconduct, the court made an inquiry into the note "out of an abundance of caution." The court questioned the juror in order to determine whether she had "made up [her] mind as to the guilt or innocence [of defendant]," and whether she was "willing to listen to the remainder of the evidence . . . before [she] start[ed] thinking about the guilt or innocence of [defendant]." The juror responded that she had "[n]ot yet" decided on defendant's guilt or innocence, and could "wait" until she had heard the remainder of the evidence before she considered defendant's guilt or innocence. The juror did not indicate that she was unable to: accept a "particular defense or penalty" as occurred in *State v. Leonard*, 296 N.C. 58, 62, 248 S.E.2d 853, 855 (1978), or abide by the "presumption of innocence" as seen

in *State v. Cunningham*, 333 N.C. 744, 754, 429 S.E.2d 718, 723 (1993). In fact, nothing suggested that the juror had spoken with other jurors about her thoughts, shared the note addressed to the judge with anyone else, or participated in any kind of misconduct.

Finally, defendant's argument that the trial court erred because it refused to allow him to examine the juror is without merit. In *Drake*, this Court was faced with a similar situation where the trial court refused to allow defense counsel to examine a juror who was accused of misconduct. 31 N.C. App. at 189, 229 S.E.2d at 53. However, unlike the present case, the trial court in *Drake* also refused to do its own investigation of the allegations despite uncontradicted evidence that jurors had discussed the case with each other before deliberations. The *Drake* Court held that "the denial of the defendant's motion[] . . . to call the juror as a witness, or to otherwise investigate and determine the alleged juror misconduct, was error . . . ." *Id.* at 193, 229 S.E.2d at 55. The Court further held that a trial court's investigation of alleged misconduct can be sufficient when "the trial court conduct[s] a careful, thorough investigation, including an examination of the juror involved when warranted and conclude[s] that the conduct ha[s] not prejudiced the jury on any key issue." *Id.* at 191, 229 S.E.2d at 54. In the present case, the trial court properly investigated the allegation of juror misconduct raised by the defendant. The investigation included an examination of the juror, and a conclusion that the alleged conduct had not prejudiced the jury. The law does not support defendant's claim that the trial court committed reversible error when it denied his request to examine the juror. We find no abuse of discretion in the trial court's actions with regard to defendant's motion to replace the juror.

### III. Prior Record Level Calculation

#### A.

[3] Defendant also argues that his prior record level was improperly calculated because it included a conviction that occurred approximately three months after defendant's sentencing in this case. Defendant argues that the inclusion of this conviction in his prior record level calculation entitles him to a new sentencing hearing. We agree.

After defendant was convicted by the jury, the State presented a prior record level worksheet that assigned defendant a prior record level of III. Defendant argues that the State's calculation of his prior record level included a conviction for "Trafficking Heroin," that

occurred on "11/8/09." This conviction would have occurred three months after his sentencing in the case at bar on 10 August 2009. Defendant contends that the State's calculation of his prior record was in violation of N.C. Gen. Stat. § 15A-1340.13(b) (2009) and N.C. Gen. Stat. § 15A-1340.14(f) (2009).

This Court reviews the calculation of a prior record level *de novo*. *State v. Fraley*, 182 N.C. App. 683, 691, 643 S.E.2d 39, 44 (2007). This Court may review a "sentence imposed [that] was unauthorized at the time imposed, exceeded the maximum authorized by law, was illegally imposed, or is otherwise invalid as a matter of law." N.C. Gen. Stat. § 15A-1446(d)(18) (2009). This review is appropriate "even though no objection, exception, or motion has been made in the trial division." N.C. Gen. Stat. § 15A-1446(d). "[T]he court shall determine the prior record level of the offender pursuant to G.S. § 15A-1340.14." N.C. Gen. Stat. § 15A-1340.13(b). "The prior record level . . . is determined by calculating the sum of the points assigned to each of the offender's prior convictions . . . ." N.C. Gen. Stat. § 15A-1340.14(a). "Under N.C.G.S. § 15A-1340.11(7), a person has a prior conviction if the person has that conviction, . . . on the date a judgment is entered." *State v. Pritchard*, 186 N.C. App. 128, 130, 649 S.E.2d 917, 919 (2007). "The State bears the burden of proving, by a preponderance of the evidence, that a prior conviction exists and that the offender before the court is the same person as the offender named in the prior conviction." N.C. Gen. Stat. § 15A-1340.14(f). Prior convictions must be proved by one of the following methods:

(1) Stipulation of the parties.

(2) An original or copy of the court record of the prior conviction.

(3) A copy of records maintained by the Division of Criminal Information, the Division of Motor Vehicles, or of the Administrative Office of the Courts.

(4) Any other method found by the court to be reliable.

N.C. Gen. Stat. § 15A-1340.14(f)(1)-(4). "A statement by the State asserting that an offender has a certain number of points, corresponding to a specified record level, is not sufficient to meet the requirements of the catchall provision found in N.C. Gen. Stat. § 15A-1340.14, even if the statement is uncontested by the defendant." *State v. Mack*, 188 N.C. App. 365, 378, 656 S.E.2d 1, 11 (2008). "The State does not satisfy its burden of proving defendant's prior record level merely by submitting a prior record level worksheet to the trial

court. '[T]he law requires more than the State's unverified assertion that a defendant was convicted of the prior crimes listed on a prior record level worksheet.' " *State v. Jeffery,* 167 N.C. App. 575, 579, 605 S.E.2d 672, 675 (2004) (internal citations omitted) (quoting *State v. Goodman,* 149 N.C. App. 57, 72, 560 S.E.2d 196, 205 (2002), *rev'd on other grounds per curiam,* 357 N.C. 43, 577 S.E.2d 619 (2003)).

In the present case, defendant's prior record level calculation was only supported by an in-court statement made by the State, and a prior record level worksheet. No original or copied court records of prior convictions were entered into evidence or submitted to the court. There also were no records submitted from the Division of Criminal Information, the Division of Motor Vehicles, or the Administrative Office of the Courts. The State argues that the information provided to the court should be sufficient under the "[a]ny other method found by the court to be reliable," clause of N.C. Gen. Stat. 15A-1340.14(f). However, this contention runs contrary to both *Mack,* 188 N.C. App. at 378, 656 S.E.2d at 11, and *Riley,* 159 N.C. App. at 557, 583 S.E.2d at 387 where, like the case at bar, the State only provided a prior record level worksheet to prove the defendant's prior record level. Accordingly, the State's evidence was insufficient to meet its burden.

The State's alternative argument that the prior record level calculation was agreed to by stipulation is equally unpersuasive. The case at bar is quite different from the facts in *Alexander,* where this Court found a stipulation had occurred when "[d]efense counsel [said] . . . 'up until this particular case [my client] ha[s] no felony convictions, as you can see from his worksheet.' " 359 N.C. at 830, 616 S.E.2d at 918. The Court in *Alexander* found that defense counsel's statement "indicate[d] not only that defense counsel was cognizant of the contents of the worksheet, but also that he had no objections to it." *Id.* However, in the present case, defense counsel objected to the prior record level worksheet as a whole, and specifically to the errors assigned by defendant. Defense counsel stated: "We're not stipulating to the record because the record is inaccurate. . . . I believe that two charges from Ohio arose on the same day. There is one conviction." Even though defense counsel failed to explicitly object to the inclusion of the trafficking charge at sentencing, "no objection is required to preserve the [sentencing] issue for appellate review." *Jeffery,* 167 N.C. App. at 579, 605 S.E.2d at 674.

By failing to meet the requirements of N.C. Gen. Stat. §15A-1340.14(f)(1)-(4), the State failed to meet its burden in proving that the convictions listed on defendant's prior record level worksheet existed at the time of sentencing. Accordingly, defendant is entitled to a new sentencing hearing in order to determine his prior record level.

B.

Finally, defendant argues that his prior record level calculation improperly included points from two felony assault convictions that occurred during the same week of trial in another state. Defendant argues that under N.C. Gen. Stat. § 15A-1340.14(d) only one of the felonies should have been used in the calculation.

Generally, "[t]he prior record level . . . is determined by calculating the sum of the points assigned to each of the offenders prior convictions . . . ." N.C. Gen. Stat. § 15A-1340.14(a). "[A] conviction occurring in a jurisdiction other than North Carolina is classified as a Class I felony if the jurisdiction in which the offense occurred classifies the offense as a felony . . . ." N.C. Gen. Stat. § 15A-1340.14(e). Per statute, two points are assigned for "each prior felony Class H or I conviction." N.C. Gen. Stat. § 15A-1340.14(b)(4). However, "if an offender is convicted of more than one offense in a single superior court during one calendar week, only the conviction for the offense with the highest point total is used." N.C. Gen. Stat. § 15A-1340.14(d). Prior convictions must be proven according to the methods outlined in N.C. Gen. Stat. § 15A-1340.14(f)(1)-(4).

The State argues that proof of conviction was not necessary in this case because defendant stipulated to the assault convictions while under oath. Inadvertent stipulation to the existence of prior convictions can occur when defense counsel makes statements about the prior record level worksheet. See State v. Hanton, 140 N.C. App. 679, 690, 540, S.E.2d 376, 383 (2000) (stating that while defendant may have stipulated to the existence of his prior convictions he did not stipulate to them being substantially similar to corresponding North Carolina felony offenses that carried higher prior record points values). However, the record does not show that defendant or defense counsel made any such stipulation. Defendant admitted on cross-examination that he had been convicted of "two felonies of assault." However, when asked in an immediate follow-up question whether the assault was in 2005, defendant responded: "Yes." Defendant's dating of the assault to 2005 prevents his testimony from stipulating to

the felony assault dated "04/05/2006." In fact, defendant's admission that the assault took place in 2005 is consistent with defense counsel's argument at sentencing that "the two charges from Ohio arose on the same day." Additionally, defense counsel stated at sentencing: "We're not stipulating to the record because the record is inaccurate . . . . [H]is prior level as stated by the State is incorrect." Neither defendant's or defense counsel's statements constituted a stipulation.

Without a stipulation, the court was left with the prosecutor's in-court statement and accompanying prior record level worksheet to prove defendant's prior convictions. This Court has held that both of those methods, without more, are insufficient to meet the State's burden. *Jeffery*, 167 N.C. App. at 579, 605 S.E.2d at 675. While the State may have proved the felony assault dated "12/21/2005" through stipulation on the part of the defendant, they failed to meet their burden to prove the existence of the felony assault dated "4/05/2006." Due to the errors that occurred at the sentencing hearing, we vacate the judgment and remand for a newsentencing hearing.

### Conclusion

Because the State failed to prove the existence of defendant's drug trafficking and felony assault convictions by a preponderance of the evidence we must remand the case for a new sentencing hearing. We find no error in the trial court's denial of defendant's motion to suppress and motion to excuse juror number one.

No error in part; remand for resentencing.

Judges CALABRIA and ARNOLD concur.